NORA BECK *v.* JOSEPH RAY BECK.

[No. 2-273A33.  Filed December 19, 1973.]

*E. Frank Welke, Cook, Cook and Welke,* of Kokomo, for appellant.

*Samuel H. Power, Power & Ponton,* of Delphi, for appellee.

HOFFMAN, C.J.—This is an appeal from a divorce proceeding in which the trial court granted the husband, Joseph Ray Beck, an absolute divorce on his cross-complaint and found that the husband was not the father of the wife's child and not liable for the child's support.

The instant proceeding was commenced on April 11, 1972, by the filing of a complaint by the wife, Nora Beck, for separation from bed and board. On April 20, 1972, by agreement of the parties reduced to a court order, the wife was given the temporary custody of the child and the husband was ordered to pay $35 per week support for the wife and child. The order included the following: "The Defendant by providing support and consenting to custody is not admitting paternity of said child." On May 12, 1972, the husband filed an answer denying each and every allegation of the complaint, and also filed a cross-complaint for absolute divorce stating that the parties were separated on August 20, 1970, and that no children were born of said marriage. On July 25, 1972, an amended counterclaim for absolute divorce was filed by the husband setting forth the additional ground of adultery. On August 11, 1972, before the trial, the wife amended her complaint to request an absolute divorce. After hearing the evidence, the trial court found for the husband on his cross-complaint and further found that the husband was not the father of his wife's child and not liable for the child's support. Judgment was entered accordingly. The wife filed a motion to correct errors which was subsequently overruled and this appeal followed.

The record discloses that appellant and appellee were married on October 8, 1967. Thereafter, on December 31, 1970, appellant gave birth to a male child. An abnormal period of gestation was not indicated. Prior to their physical separation in July, 1970, both parties had been living together in Delphi, Indiana. Appellee testified that he had no sexual relations with appellant from January through July of that year.

On April 20, 1972, both parties to this action, together with the child, voluntarily submitted to a blood test relating to the question of paternity. During the subsequent trial, defendant Joseph Ray Beck was successful in introducing the expert testimony of Dr. Joseph Dean Gifford, a pathologist who had supervised the administration of the tests.

Dr. Gifford testified that he had had four years specialty training in pathology; that he had been a licensed physician in the State of Indiana since 1965, and that he provided laboratory services at Dukes Memorial Hospital in Peru, Indiana, and Wabash County Hospital in Wabash, Indiana.

Further, on direct examination, Dr. Gifford was asked if he had occasion to perform a test for Joseph Ray Beck and Nora Beck. Thereupon, plaintiff Nora Beck objected to any evidence pertaining to a blood grouping test on the ground that such evidence was not admissible in a divorce proceeding. The court overruled the objection and plaintiff was subsequently permitted to register a continuing objection to this particular line of questioning.

When direct examination was resumed, Dr. Gifford identified the plaintiff, the defendant and the child as the persons to whom blood grouping tests had been administered in his presence in the laboratory of Dukes Memorial Hospital.

The parties and the child underwent testing for major blood group, Rh-typing, MN-typing and S-typing. From the results of the Rh-typing tests, Dr. Gifford concluded that paternity was excluded.

The initial point of inquiry necessarily centers around the question of whether the trial court acted improperly in permitting the results of blood grouping tests to be admitted into evidence.

Although by authority of IC 1971, 34-3-3-1 (Burns Code Edition), the results of blood grouping tests may be admitted in paternity actions under certain conditions, our research has disclosed no Indiana cases in which the question of ad-

missibility of blood tests in divorce proceedings has been in issue. However, the absence of direct authority in this regard does not, in any way, controvert the proposition that test results may be admissible under circumstances not unlike those existent in the present case. Indeed, such a proposition finds indirect support in the language of Rule TR. 35(A), Ind. Rules of Procedure, which provides, in pertinent part, as follows:

> "When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a physician or to produce for examination the person in his custody or legal control. * * *."

It is to be noted that Fed. R. Civ. P. 35(a), upon which the Indiana rule is patterned, has been applied to divorce actions in which the paternity of a child was at issue.

In an action for maintenance by an infant wife against her husband in which the husband counterclaimed for divorce on the ground of adultery, the court in *Beach* v. *Beach* (1940), 72 App.D.C. 318, 114 F. 2d 479, 131 A.L.R. 804, observed that Fed. R. Civ. P. 35(a), *supra,* was procedural in that it related exclusively to the obtaining of evidence and was, therefore, not confined in its scope to actions for damages for personal injuries. The court thereupon concluded that the rule empowered the trial court to make an order requiring the wife and child to submit to a blood grouping test for the purpose of comparison of their blood with that of the husband.[1] See also: *Rider* v. *Rider* (1964), 110 Ga.App. 382, 138 S.E.2d 621; *State* v. *Cornett* (Okla. 1964), 391 P.2d 277; *Anonymous* v. *Anonymous* (1956), 1 A.D.2d 312, 150 N.Y.S. 2d 344.

While the principal holding in *Beach* does not bear directly upon the question here in issue, it must be viewed as having

---

1. Fed. R. Civ. P. 35(a), did not contain the phrase "(including the blood group)" at the time of the decision in *Beach* v. *Beach, supra.*

been premised upon the assumption that evidence derived from blood grouping tests is admissible in such a case. Indeed, it is the natural implication of that decision which provides a valuable guide to the disposition of the case at bar—for *Beach* discloses an attitude which is representative of an increasing predilection to recognize and accord considerable weight to evidence obtained through the use of such tests. See: 1 Jones on Evidence, (6th Ed. 1972), § 3.80, at 290; Schatkin, Disputed Paternity Proceedings, (3d Ed. 1953), at 289-356.

The accuracy and reliability of blood grouping tests were first acknowledged by American courts in proceedings of a criminal nature. *Commonwealth, ex rel.* v. *Visocki* (1935), 23 Pa. D & C 103; *State* v. *Damm* (1933), 62 S.D. 123, 252 N.W. 7, 104 A.L.R. 430, (aff'd. on rehearing, 64 S.D. 309, 266 N.W. 667, 104 A.L.R. 441) ; *Commonwealth* v. *Zammarelli* (1931), 17 Pa. D & C 229. More recent decision have recognized the admissibility of such evidence in bastardy proceedings. *Jordan* v. *Mace* (1949), 144 Me. 351, 69 A. 2d 670; *Saks* v. *Saks* (1947), 189 Misc. 667, 71 N.Y.S. 2d 797; and in civil actions for support, *Cortese* v. *Cortese* (1950), 10 N.J. Super. 152, 76 A. 2d 717.

In addition, it is generally held that results of blood grouping tests establishing non-paternity are admissible in divorce actions in which the paternity of a child is in question. *Jackson* v. *Jackson* (1967), 67 C. 2d 245, 60 Cal. Rptr. 649, 430 P. 2d 289; *Houghton* v. *Houghton* (1965), 179 Neb. 275, 137 N.W. 2d 861; *Groulx* v. *Groulx* (1954), 98 N.H. 481, 103 A. 2d 188, 46 A.L.R. 2d 994; *Cuneo* v. *Cuneo* (1950), 198 Misc. 240, 96 N.Y.S. 2d 899; *Anthony* v. *Anthony* (1950), 9 N.J. Super. 411, 74 A. 2d 919. See: Anno. 46 A.L.R. 2d 1000; Anno. 163 A.L.R. 939.

It should, however, be emphasized that among the several jurisdictions so disposed, admissibility is necessarily conditioned upon a demonstration that the tests were conducted by a qualified expert and that the results of the tests exclude

paternity. The requirement of exclusion derives simply from the fact that blood tests cannot disclose the identity of the biological father. Rather, they can only reveal that a particular person could not be the father. See: 1 Wigmore, *Evidence* (3d Ed. 1940), § 165 (a), at 610.

The condition requiring expertise on the part of the person or persons conducting the testing and the condition that the results of the tests must exclude paternity have been satisfied in the case at bar.

The prevailing view that results of blood grouping tests are admissible in divorce proceedings is not to be regarded lightly. Indeed, the forces of logic and reason demand adherence to such a position in this instance and further necessitate the conclusion that the trial court did not err in permitting Dr. Gifford to testify as to the results of the tests.

The prefatory note to the Uniform Act on Blood Tests to Determine Paternity, 9 Uniform Laws Anno., at 102, (1957), succinctly states the rationale of courts in reaching similar conclusions:

"In paternity proceedings, divorce actions and other types of cases in which the legitimacy of a child is in issue, the modern developments of science have made it possible to determine with certainty in a large number of cases that one charged with being the father of a child could not be. Scientific methods may determine that one is not the father of the child by the analysis of blood samples taken from the mother, the child, and the alleged father in many cases, but it cannot be shown that a man is the father of the child. If the negative fact is established it is evident that there is a great miscarriage of justice to permit juries to hold on the basis of oral testimony, passion or sympathy, that the person charged is the father and is responsible for the support of the child and other incidents of paternity. * * * There is no need for a dispute among the experts, and true experts will not disagree. Every test will show the same results. * * *.

"As to the make-up of the blood, the testing process is reasonably simple. It is practically the same thing in which the 11 million or more men were tested in determining blood types in the service. It is the same kind of test made of

the blood donors to the Red Cross and hospital blood banks. Consequently, this is one of the few classes of cases in which judgment of [the] court may be absolutely right by use of science.   *   *   *."

When medical science has perfected certain tests to the point where it can be said with almost medical certainty that something is a fact, the court should not hide in the dark ages and be bound by archaic rules which subvert the truth and impede the sound administration of justice. Our whole system of justice is a means to arrive at the truth. Our modern rules of discovery, pre-trial hearings and to some extent our rules of evidence were drawn to permit the trier of the case to hear all the pertinent facts so that the truth might be more readily ascertained.

In the past, a finding that a child was born out of wedlock placed a strong social stigma upon the innocent child. However, today such stigma is rapidly disappearing as have social proscriptions against a girl showing her ankles or a man wearing a topless bathing suit. Today's society no longer condemns a child for the transgressions of the parents.

In the instant case, when the husband never accepted the child as his own; when he never supported the child except by court order based upon an agreement expressly stating that he is not admitting paternity of the child; when the husband denied having sexual intercourse with his wife during the period of conception; and when both parties voluntarily submitted to blood tests; it would result in a travesty of justice to hold the results of the tests to be inadmissible as evidence. The trial court's admission of the results of blood grouping tests which excluded the husband as being the father of the child was therefore proper and entirely justified under the circumstances.

The next question to be considered is whether the trial court erred in finding that Joseph Ray Beck was not the father of his wife's child.

The law presumes that a child born during wedlock is legitimate. *A— B—* v. *C— D—* (1971), 150 Ind. App. 535, 277 N.E.2d 599, 28 Ind.Dec. 523 (transfer denied); *Profitt* v. *Profitt* (1965), 137 Ind.App. 6, 204 N.E.2d 660; *Duke* v. *Duke* (1962), 134 Ind.App. 172, 185 N.E.2d 478. Although at common-law this presumption was conclusive, it is now well-established that it may be overcome by evidence which is direct, clear and convincing. *Hooley* v. *Hooley* (1967), 141 Ind.App. 101, 226 N.E.2d 344; *Whitman* v. *Whitman* (1966), 140 Ind.App. 289, 215 N.E.2d 689; *Pursley* v. *Hisch* (1949), 119 Ind.App. 232, 85 N.E.2d 270. Thus, on appeal, reviewing the evidence most favorable to the appellee, the question becomes one of whether the trial court could find that the evidence was direct, clear and convincing.

In *Phillips* v. *State, ex rel.* (1925), 82 Ind.App. 356, at 360, 145 N.E. 895, at 897, it was stated that,

"[T]he presumption could be overcome by proof that the husband was impotent; or that he was entirely absent so as to have had no access to the mother; or was entirely absent at the time the child in the course of nature must have been begotten; or was present only under such circumstances as to afford clear and satisfactory proof that there was no sexual intercourse."

The existing exceptions to the presumption of legitimacy which were set forth in *Phillips* have been regarded as being susceptible to expansion. For example, the court in *Whitman* v. *Whitman, supra,* held that sterility of the husband, if conclusively shown, might also overcome the presumption. Moreover, the proposition that the number of exceptions to the presumption of legitimacy may be augmented is not abrogated by the decision in *Buchanan* v. *Buchanan* (1971), 256 Ind. 119, 267 N.E.2d 155.

Thus, where the appellee denied having sexual relations with his wife during the possible period of conception; where the wife traveled to another town with a man other than her

husband; where the wife had been in taverns with other men; where the husband consistently denied being the father of his wife's child; where the parties did not live together after the time when the wife disclosed her pregnancy; and where the results of blood tests showed that the husband was excluded as being the father of the child; the trial court did not err in finding that all of the evidence, considered together, constituted direct, clear and convincing proof that Joseph Ray Beck was not the father of his wife's child.

No reversible error having been shown, the judgment of the trial court is, therefore, affirmed.

Affirmed.

Lybrook and Staton, JJ., concur.

NOTE.—Reported at 304 N.E.2d 541.