**STATE of Minnesota on Behalf of Jodi Ann ORTLOFF, petitioner, Respondent,**

v.

**Michael Lynn HANSON, Appellant.**

No. 48572.

Supreme Court of Minnesota.

March 23, 1979.

Robins, Davis & Lyons and Robert M. Wattson, Minneapolis, Carter & Carter and Robert C. Carter, Roseau, for appellant.

Robert D. Stroble, Asst. County Atty., Thief River Falls, for respondent.

PETERSON, Justice.

This is a paternity action brought pursuant to Minn.St. 257.251 to 257.31. Defendant, who was found by the jury to be the father, contends on this appeal that the evidence that he is the father of the child is legally insufficient, that the plaintiff's counsel committed prejudicial misconduct in his cross-examination of defendant and another witness, that the court erred in awarding $1,775.40 in pregnancy and maintenance expenses of the mother, and that the court erred in taxing defendant $300 in expert witness fees for the testimony of the attending physician.

1. The only issue which merits extensive comment is defendant's contention that the complainant's attorney committed prejudicial misconduct in cross-examining defendant about whether he had ever requested a blood test. The trial court sustained defense counsel's objection to this question and two similar follow-up questions, but defendant contends that the mere asking of the questions prejudiced him.

In *State v. Andrews*, 297 Minn. 260, 212 N.W.2d 863 (1973), certiorari denied, 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974), this court held that admission in a DWI prosecution of evidence of the defendant's refusal to submit to chemical testing violated the defendant's privilege against compulsory self-incrimination. However, the reasoning of that case would not apply here, since the jury could not infer from defendant's refusal that defendant thought he was guilty of some crime. Rather, the likely inference which the jury would have drawn was that defendant refused to testify because the results would not be favorable to him, not because he feared it would prove him guilty of a crime.

Because the answer sought by the complainant's counsel was relevant and because the rationale of *Andrews* does not apply, we do not believe that counsel should be faulted for asking the question initially. This is not to say that the trial court erred in sustaining the objection, since the trial court had discretion to keep the evidence out on the theory that the potential of the evidence for unfair prejudice outweighed its relevance in this case. Nor is it to say that counsel acted properly in pursuing this line of questioning after the court made its ruling on the matter clear. However, we do not agree with defendant's contention that the mere asking of the questions necessitates a retrial. See, *C. M. C. v. A. P. F.*, 257 N.W.2d 282 (Minn.1977).

Underlying our opinion that it is not improper for a party to elicit evidence that the other party refused to submit to blood testing is our belief that blood-test procedures provide the most reliable means for making the determination of paternity more accurate and efficient.

Recently, a joint committee of the A. M. A. and the Section of Family Law of the A. B. A. adopted a set of guidelines on the use

of blood testing in disputed paternity cases. See, Joint AMA–ABA Guidelines: *Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Family L.Q. 247. The committee recommends the use of up to seven different blood tests, using more general tests first, with the testing on the blood samples proceeding in stages, stopping only after the putative father has been excluded as the father or all seven tests have been used. If the blood is subjected to all seven of the screening tests recommended by the committee, there is a 91- to 93-percent probability that if the putative father is in fact not the father, one of the seven tests will have excluded him as the father. In those cases in which the use of all seven tests does not exclude the putative father and he still maintains that he is not the father, the committee recommends that certain scientific formulas be used to calculate the likelihood that he *is* the father. Basically, what the expert does is estimate the likelihood that the putative father is the actual father by taking the frequency of the blood constellation of the putative father among real fathers for that mother/child combination and compares it with the frequency of the father's genetic constellation in the general population.

While formerly there were very few laboratories which could perform these tests, the Federal government has established regional laboratories throughout the country for thorough analysis and classification of blood for the purpose of determining paternity. At least one such laboratory has been established in Minnesota.

While these accurate tests are available at relatively low cost, Minnesota does not have any statutory procedure specifically designed to meet the problem. Rule 35.01, Rules of Civil Procedure, does provide the court with authority to order a party to submit to a blood examination in an action in which the blood relationship of a party is in controversy, but we believe it would be helpful if the legislature would consider the entire matter of blood testing in the context of paternity actions. See, in addition to Joint AMA–ABA Guidelines: *Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Family L.Q. 247, Uniform Act on Blood Tests to Determine Paternity, §§ 1, 4; Uniform Paternity Act, §§ 7, 10; and Uniform Parentage Act, §§ 11, 12.[1]

2. The other issues raised by defendant do not merit detailed discussion. Complainant's lawyer did err in cross-examining a defense witness about an assault charge that had been made against him and about his father's driving record, but the jury was instructed to disregard these questions and the testimony of this witness was significantly impeached so that it is doubtful that the jury would have given much credence to it in any event. Defendant's claim that the evidence was legally insufficient has no merit. Similarly, we do not believe that the court abused its discretion in the taxing of the expert witness fee.

We do remand to the district court the issue of whether the court awarded an

1. In recent years there has been an increase not only in the absolute number of illegitimate births each year but in the rate of illegitimate births. Nationwide, the rate now exceeds 10 percent of all births. Joint AMA–ABA Guidelines: *Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Family L.Q. 247, 249. In Minnesota the figure for the most recent year for which statistics are available, 1976, was 9.6 percent. State Department of Health, Statistics Division. Because of the huge amount of public money which is being spent to assist in the care of many of these children, the Federal government has required states to develop plans for the ascertainment of paternity if states wish to take advantage of Federal programs. Pub.L. 93–647. Secretary

Joseph Califano, Jr., of the Department of Health, Education and Welfare, reported that HEW "Project Responsibility," which is a program that finances 75 percent of the cost of establishing paternity and collecting child support from absent parents, has resulted in a tracking down of nearly a million fathers and "has proved to be enormously cost effective." Minneapolis Tribune, February 12, 1979, p. 4A, col. 2. It may be only a matter of time before the Federal government adopts uniform procedures relating to the use of blood tests to determine paternity. Once that is done, Minnesota may be forced to adopt procedures specifically dealing with the use of blood tests in paternity actions or face the loss of Federal funds.

excessive amount for expenses related to the pregnancy and maintenance of the mother. The basis upon which the court computed that amount is unclear.

Affirmed in part; remanded in part.