[No. 3811-4-III.  Division Three.  May 21, 1981.]

SANDY HAYWARD, *Respondent,* v. LYLE RAY HANSEN, *Appellant.*

*John Montgomery, Ronald P. Arkills,* and *Feltman, Frost & Montgomery,* for appellant.

*Jeffrey H. Hartje, Alan L. McNeil,* and *Edward J. Hunt, Legal Intern,* of *University Legal Assistance,* for respondent.

MUNSON, J.—Lyle Hansen appeals the dismissal of his motion to vacate default judgment in favor of Sandy Hayward in a paternity action.

Hayward initiated this paternity action in 1977, alleging that Hansen was the natural father of Alisha Hayward, born May 6, 1977. Barbara Hayward, the child's maternal grandmother, was appointed guardian ad litem for Alisha at that time; as guardian ad litem, the record does not reflect she has taken any legal steps on behalf of Alisha nor signed any documents.

Hansen was personally served and an attorney entered an appearance on his behalf; the attorney withdrew in March 1978. Hayward moved for default; the matter was continued when Hansen asked for additional time to obtain other counsel. Hayward again moved for default judgment in September 1978; a copy of notice of intent to take default judgment was sent to Hansen by certified mail, but the letter was returned marked "refused." Attempts to notify Hansen by telephone were also unsuccessful. Thus, a default judgment was entered October 4, 1978. Fifteen months later, on January 2, 1980, Hansen moved for vacation of the default judgment pursuant to CR 60(b); the motion was denied and this appeal ensued.

Hansen first argues that the trial court lacked subject matter jurisdiction to find paternity in this case because Alisha was never served and therefore never brought before

the court as a party. We disagree.

RCW 26.26.090 states:

> The child shall be made a party to the action. If he is a minor he shall be represented by his general guardian or a guardian ad litem appointed by the court. The child's mother or father may not represent the child as guardian or otherwise.

In *State v. Douty,* 92 Wn.2d 930, 603 P.2d 373 (1979), the court found the failure to serve the child in a paternity action deprived the trial court of jurisdiction. However, in *Douty,* the paternity action was brought by the State. Here, Alisha's mother, Sandy Hayward, initiated this action. At least until such time as the action was filed, thus invoking RCW 26.26.090, Sandy Hayward could and did function as Alisha's representative. She existed in that capacity long enough to bring the child before the court as a party. At that point, the court acquired continuing jurisdiction pursuant to RCW 4.28.020, which states:

> From the time of the commencement of the action by service of summons, or by the filing of a complaint, or as otherwise provided, the court is deemed to have acquired jurisdiction and to have control of all subsequent proceedings.

Once the complaint was filed, the court had an obligation to appoint a guardian ad litem to represent the child in further proceedings. RCW 26.26.090.[1] Clearly, the court had personal jurisdiction over the child. To interpret the requirements of the Uniform Parentage Act in any other fashion would be to make nugatory the provision of RCW 26.26.060(1)(a) which states:

> (1) *A child,* his *natural mother,* or a man presumed to be his father under RCW 26.26.040 may bring an action
> (a) at any time for the purpose of declaring the existence of the father and child relationship presumed under RCW 26.26.040; . . .

(Italics ours.) Since the mother may bring an action, and

---

[1]RCW 74.20.310, eliminating the need for a guardian ad litem, was passed in 1979, long after this action was begun and after the default judgment was entered.

since in doing so in her representative capacity she brings the child before the court, the child has been made a complaining party. This satisfies the requirements of RCW 26.26.090.

The argument that the child must be personally served in the action is, we think, erroneous. The child is the instigating party. It is often said that parties may not consent to the court's subject matter jurisdiction, 2 L. Orland, Wash. Prac. § 32, at 54 (1972), but here it is personal jurisdiction over the child which triggers the court's jurisdiction pursuant to RCW 26.26.090. Personal jurisdiction may also be acquired by consent, *see, e.g.,* RCW 4.28.020; 2 L. Orland, Wash. Prac. § 10, at 7 (1972). We therefore find no merit in Hansen's claim that the trial court lacked subject matter jurisdiction;[2] we will proceed to his other assignments of error.

█ Hansen next argues that he should have been arrested pursuant to RCW 26.26.070 before a default judgment could be entered against him. RCW 26.26.070(1) states in part:

> The petitioner in an action to determine the existence of the father and child relationship may petition the court to issue a warrant for the arrest of the alleged father at any stage of the proceeding . . .

The use of the word "may" clearly indicates that the use of this statute is at the discretion of the petitioner or the court; furthermore, if the petitioner elects to seek a warrant, she must then show:

> (a) The alleged father will not appear in response to a summons; or (b) the summons cannot be served; or (c) the alleged father is likely to leave the jurisdiction; or (d) the safety of the petitioner would be endangered if the warrant did not issue.

RCW 26.26.070(2). Such a showing would have been difficult if not impossible in this case, since Hansen had already appeared by counsel and in person, did not seem likely to

---

[2]RCW 4.28.080 relates to the service of a summons. Subsection (11) speaks to service *against* a minor under 14 years of age, *not by* such minor.

leave the jurisdiction, and did not threaten the safety of the petitioner. In any event, the issuance of an arrest warrant is at the discretion of the trial court. The statute also provides that the father shall be released on his own recognizance pending trial unless the court determines that such recognizance will not reasonably assure his appearance. RCW 26.26.070(4) and (6). Nothing in the statutes suggests that arrest is a precondition to pursuing a default judgment; to the contrary, arrest appears to be an extraordinary remedy, intended for use only in those situations set forth in the statutes. We find no error.

Hansen argues the trial court abused its discretion in refusing to vacate the default judgment. In his motion to vacate, Hansen alleged five bases in support of his CR 60(b) motion: (1) mistake, inadvertence, or excusable neglect, CR 60(b)(1); (2) fraud, misrepresentation and misconduct, CR 60(b)(4); (3) unavoidable casualty or misfortune preventing the appellant from defending his action, CR 60(b)(9); (4) misunderstanding of the nature and extent of the proceedings brought against him, CR 60(b)(11); and (5) "[i]n view of the nature of the action (*i.e.*, paternity)," CR 60(b)(11).

Because the motion to vacate was brought more than 1 year after the order was entered, the grounds of mistake, inadvertence and excusable neglect are foreclosed. *See* CR 60(b). Fraud, misrepresentation or misconduct and unavoidable casualty or misfortune are grounds which find no support in the record, and no affidavit asserting facts supporting these grounds appears in the record. *See* CR 60(e)(1).

As to misunderstanding the nature and extent of proceedings brought against him, Hansen relies on the fact that his former attorney had withdrawn as attorney of record on March 21, 1978, but Hansen did not learn of this until the time of the default judgment motion. However, the former attorney filed an affidavit indicating he personally notified the appellant of his intent to withdraw and that notice of intent to withdraw was sent to Hansen on

March 6, 1978. Furthermore, Hansen personally appeared at the first hearing on the motion for default judgment to request a continuance. In short, there is no credence to his claim that he did not know that his lawyer had withdrawn. Finally, the fact that this is a paternity action does not confer special status upon his motion to vacate a default judgment.

A motion to vacate a default judgment is addressed to the discretion of the trial court, which will not be disturbed absent a showing of an abuse of discretion. *Commercial Courier Serv., Inc. v. Miller,* 13 Wn. App. 98, 107, 533 P.2d 852 (1975). The moving party must establish, through affidavits, facts constituting a defense to the default judgment; Hansen has failed to do so. His supposed absolute defense of sterility is in fact considerably lacking in probative value. The fact that he is probably unable to father a child 3 years after the conception of the child in this action has no bearing on his fertility at the time of conception. Furthermore, Hansen admits to a sperm count of 15,200,000 per cc. The minimum sperm count necessary to impregnate is 10 million per cc. *See Cochran v. Cochran,* 2 Wn. App. 514, 468 P.2d 729 (1970). Thus, Hansen was not sterile; he was merely less fertile. The trial court abuses its discretion only when no reasonable person would have ruled in the manner pursued by the trial court. *In re Marriage of Nicholson,* 17 Wn. App. 110, 114, 561 P.2d 1116 (1977). We cannot say the trial court abused its discretion.

Lastly, Hansen offers no valid excuse or justification for a 15-month delay in seeking to vacate the judgment. His counsel candidly stated, in response to questions from the bench during oral argument before this court, that his services were not sought until a criminal prosecution for nonsupport and a Department of Social and Health Services subrogation action for back support were instituted. These actions precipitated the motion to vacate. Hansen's present predicament stems from his own inaction; no justification to vacate has been shown.

The judgment of the trial court is affirmed.

GREEN, J., concurs.

McINTURFF, C.J. (dissenting)—I dissent for two reasons. First, the court did not have jurisdiction over Alisha's paternity. Compliance with mandated service requirements is necessary for the court to adjudicate any dispute. Under RCW 4.28.020 the court acquires jurisdiction in a matter from the time of commencement of the action. However, an action may not continue in the absence of a necessary party. RCW 26.26.090 states:

> The child *shall* by made a party to the action. If he is a minor he shall be represented by his general guardian or a guardian ad litem appointed by the court. *The child's mother or father may not represent the child as guardian or otherwise.*

(Italics mine.) Additionally, RCW 4.28.080(11)[3] requires that minors less than 14 years of age be personally served, as well as their parents. Alisha, 4 years of age, was never served; she was never made a party to the action which is a precondition to subject matter jurisdiction under the parentage act (RCW 26.26). Moreover, her guardian, who was her grandmother, never consented to the court's personal jurisdiction. The court has jurisdiction to appoint a guardian ad litem, but it is necessary for either the guardian to consent to service on the part of the child, or that the child herself be served, to bring the child before the court as a party.

This was the precise issue before the court in *State v. Douty*, 92 Wn.2d 930, 603 P.2d 373 (1979). There, a pater-

---

[3]RCW 4.28.080(11) states:

"If against a minor under the age of fourteen years, to such minor personally, and also to his father, mother, guardian, or if there be none within this state, then to any person having the care or control of such minor, or with whom he resides, or in whose service he is employed, if such there be."

nity action was initiated by the prosecutor,[4] and a guardian ad litem need not have been appointed pursuant to RCW 74.20.310.[5] Nonetheless, the applicable provisions of the Uniform Parentage Act were the same; the child was deemed an indispensable party to the action. The failure to serve the child deprived the court of jurisdiction to enter judgment. The court in *Douty* stated at pages 932–33:

> Initially, it should be noted that the child, though named in the action, was never served. Consequently, he is not before the court. Under RCW 26.26.090, the child "shall be made a party to the action." A minor child is to be represented by a general guardian or a guardian ad litem. At least one court has held that the absence of the child, as an indispensable party, deprives the trial court of jurisdiction to enter a judgment under the California version of the UPA. *See Perez v. Department of Health*, 71 Cal. App. 3d 923, 138 Cal. Rptr. 32 (1977). Applying the reasoning of the California court, the instant case would be subject to dismissal.

This is consistent with the apparent intent of the drafters of the Uniform Parentage Act; that a parentage action may be brought by the child, as well as by one of the parents, and therefore, the child must be a party in the *full sense*. *See Jefferson County Dep't of Social Servs. v. D.A.G.*, ___ Colo. ___, 607 P.2d 1004 (1980); *A.G. v. S.G.*, ___ Colo. ___,

---

[4]That the State brought the action in *Douty* does not distinguish it from the instant facts. The appearance of the guardian ad litem in this action does not confer jurisdiction upon the court without first serving the minor.

[5]RCW 74.20.310, enacted after *Douty* (Laws of 1979, 1st Ex. Sess., ch. 171, § 15, p. 1607) states:

"The provisions of RCW 26.26.090 requiring appointment of a general guardian or guardian ad litem to represent the child in an action brought to determine the parent and child relationship do not apply to actions brought under chapter 26.26 RCW if:

"(1) The action is brought by the attorney general on behalf of the department of social and health services, the child, or the natural mother; or

"(2) The action is brought by any prosecuting attorney on behalf of the state, the child, or the natural mother when referral has been made to the prosecuting attorney by the department of social and health services requesting such action.

"The court, on its own motion or on motion of a party, may appoint a guardian ad litem when necessary."

___, 609 P.2d 121, 123 n.5 (1980).

Here, the child was not served although she was named as a party to the action. Our Supreme Court in *Douty* held that because the child was not served, the child was not before the court. She is an indispensable party. *Douty, supra* at 932. Lacking an indispensable party in the instant case, the trial court lacked personal jurisdiction; thus its determination of parentage was void ab initio.

Even if, under the majority's rationale, the court had jurisdiction to determine parentage, I would remand for the purpose of allowing Mr. Hansen the opportunity to undergo blood tests to substantiate his denial of paternity. Even though the defendant may be viewed as guilty of laches for not complying within the appropriate time frame, I accept the rationale adopted by the court in *Wessels v. Swanson,* 289 N.W.2d 469 (Minn. 1979). There, the defendant appealed from a denial of his motion to vacate a default judgment which determined him to be the parent of a child. The Supreme Court of Minnesota determined that although the trial court did not abuse its discretion in adjudicating him to be the father, affirmance of the order was directed to be effective 90 days from the filing of its opinion unless, within that time, the defendant presented evidence of a reliable blood test to substantiate his denial of paternity. The court stated:

> We are cognizant, however, not only of the financial burden placed upon defendant as a result of the adjudication of parentage, but also of the even more significant consequences of the adjudication both for him and the other persons affected by it. . . . Such consequences require that an adjudication of paternity be based on the most reliable kind of evidence available. . . . [W]e have recognized that recently developed and highly sophisticated blood–grouping tests may furnish such evidence and have urged the legislature to consider the matter of blood testing in the context of paternity actions. In this case we have concluded that if such tests furnish reliable evidence substantiating defendant's denial of paternity, such evidence would furnish a reason justifying relief from the operation of the judgment . . .

*Wessels,* at 470.

The evidence of his blood test is obviously material to the case and could well affect its outcome.[6] As stated in Beautyman, *Paternity Actions—A Matter of Opinion or a Trial of the Blood?,* J. Legal Med., April 1976, at 17, 19:

> Given the genotypes of a child and its mother, a scientist can state positively that men of certain blood types could not be the father. There are two classes of exclusion:
>
> 1. A man is excluded if he and the mother both lack a gene that the child has, because a child cannot have a gene lacked by both parents. For example, an O father and an A mother cannot have a B child because neither putative parent has the B gene.
>
> 2. A man is excluded if genes he must hand on are not

---

[6]In *Carlyon v. Weeks,* 387 So. 2d 465, 466 (Fla. Dist. Ct. App. 1980), the court stated the following, discussing the benefits and reliability of human leukocyte antigen (HLA) testing and its probative value on the issue of paternity: "Paternity can be excluded with certainty in certain cases by blood testing, but it can never be proven with certainty."

In *Hepfel v. Bashaw,* 279 N.W.2d 342, 345 (Minn. 1979), the court noted:

[A]ppallingly little attention is given to the accuracy of the determination. Professor Harry D. Krause, in a study of illegitimacy law and social policy, found that—

"* * * conviction rates reaching 95% are not uncommon in paternity actions. * * *

""Testimony from the sitting judiciary hearing paternity cases revealed to the Commission . . . that the evidence in most cases consists of an accusation . by the woman and a denial by the defendant. Under such circumstances, the judges feel constrained to enter a finding of paternity. . . .

"In these circumstances, it is not surprising that a study based on blood tests indicated that in a group of 1,000 cases of disputed paternity, 39.6 per cent of the accused men were not actually the fathers of the children in question.

*See also* Terasaki, *Resolution by HLA Testing of 1000 Paternity Cases Not Excluded by ABO Testing,* 16 J. Fam. L. 543 (1978); Shaw & Kass, *Illegitimacy, Child Support and Paternity Testing,* 13 Hous. L. Rev. 41, 51 (1975).

Recent cases which allowed blood tests for the purpose of establishing nonpaternity include: *Winston v. Robinson,* 270 Ark. 996, 1000–01, 606 S.W.2d 757, 760 (1980); *People v. Askew,* 74 Ill. App. 3d 743, 747, 393 N.E.2d 1124, 1128 (1979); *McGowan v. Poche,* 393 So. 2d 278, 280 (La. Ct. App. 1980); *Ramsey County v. S.M.F.,* 298 N.W.2d 40, 44 (Minn. 1980); *State ex rel. Ortloff v. Hanson,* 277 N.W.2d 205, 206 (Minn. 1979); *Bunting v. Beacham,* 45 N.C. App. 304, 306, 262 S.E.2d 672, 674 (1980); *Hansen v. Hansen,* 119 N.H. 473, 475, 402 A.2d 1333, 1334 (1979); *Parenti v. Parenti,* 263 Pa. Super. Ct. 282, 397 A.2d 1210 (1979); *State v. Lawson,* ___ W. Va. ___, ___, 267 S.E.2d 438, 439 (1980).

present in the child. For example, an AB man cannot have an O child, because an AB parent must contribute either an A or a B gene to the child.

(Footnote omitted.) Absent blood tests, Mr. Hansen would be unable to present sufficient evidence he was not the father.[7] Under Washington's Uniform Parentage Act only clear, cogent and convincing proof may rebut the strong presumption of paternity. RCW 26.26.040(5). A blood test here may conclusively prove the nonpaternity of Mr. Hansen.

Moreover, RCW 26.26.100(1) provides: "The court may, *and upon request of a party shall,* require the child, mother, or alleged father to submit to blood tests." (Italics mine.) I do not view RCW 26.26.100 to be limited to pre-trial motions. The act is remedial in nature and is to be construed liberally to accomplish the purpose for which it was enacted. *Douty, supra* at 936. Consequently, Mr. Hansen's request for a blood test to provide a defense to paternity was not untimely merely because it was made at a hearing on a postdefault motion. *See Wessels, supra* at 470.

Mr. Hansen has a substantial interest in the accuracy and outcome of the adjudication. He has a direct financial interest since he could be contributing to the support of Alisha throughout her minority. In addition to financial interests, Mr. Hansen, if found to be the father, is also indirectly threatened with loss of liberty since criminal prosecution for nonsupport has been initiated, which may result in incarceration.

For the foregoing reasons, and to insure justice will be accomplished, I would set aside the default judgment and remand the case to allow Mr. Hansen the opportunity to provide proof of nonpaternity. No prejudice would result to

---

[7]Mr. Hansen's only defense under the Uniform Parentage Act was that he was not the father. To preclude him from introducing blood tests has the effect of denying him a defense. A denial of this defense constitutes a violation of due process. *See People v. Graham,* 48 Ill. App. 3d 689, 692, 363 N.E.2d 124, 127 (1977); *see also Webb v. Texas,* 409 U.S. 95, 98, 34 L. Ed. 2d 330, 333, 93 S. Ct. 351 (1972).

any party. The interests of the child,[8] parents, society and our system of justice are not furthered by denial of an opportunity for an accurate determination of nonparentage. As stated in a well known English case where a blood test proved adultery: "'There is nothing more shocking than that injustice should be done on the basis of a legal presumption when justice can be done on the basis of fact. . . .'" J. Legal Med., April 1976, at 17, 25, citing *H. v. H.,* [1966] 1 All E.R. 356.

Reconsideration denied June 16, 1981.

Review granted by Supreme Court September 25, 1981.

---

[8]Recently in *Throndset v. J.R.,* 302 N.W.2d 769 (N.D. 1981), the Supreme Court of North Dakota, in dealing with a similar issue declared at page 774:

> Our concern is with the effect of such an order on [the child] as she matures and becomes an adult. Paternity may be denied by the putative father or a man determined to be the father after judicial proceedings. That denial may well have a more detrimental effect on a child when the judicial proceedings have culminated in a default judgment which the court has refused to vacate upon the request of a man who wishes to have blood tests taken to determine his parenthood and who seemingly questions whether or not he is the actual father of the child. Our concern is with [the child] rather than with [the putative father].