918 P.2d 203

Lisa M. ANTONSEN, Petitioner,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA, the Honorable J.D. Howe, a judge thereof, Respondent Judge,

Warren A. ANTONSEN, Timothy Witt, Real Parties in Interest.

No. 1 CA–SA 95–0352.

Court of Appeals of Arizona, Division 1, Department C.

March 12, 1996.

Review Denied June 19, 1996.

Community Legal Services by George H. McKay, Lisa A. Moore, Jennifer R. Hunter, Peoria, for Petitioner.

David L. Erlichman, Phoenix, for Real Party in Interest Antonsen.

## OPINION

CONTRERAS, Presiding Judge.

In this special action, the mother of a child involved in consolidated paternity and dissolution actions challenges the trial court's refusal to order blood testing in the paternity action pursuant to Ariz.Rev.Stat.Ann.

(A.R.S.) section 12–847(C),[1] after the trial court applied the discretionary "good cause" requirement of Rule 35(a),[2] Arizona Rules of Civil Procedure, to mother's request for blood testing. Also at issue is the trial court's subsequent expressed intention to decide custody issues in the pending dissolution action only between the husband/presumed father and mother without regard to the putative father's paternity claim.

### Facts and Procedural Background

Petitioner Lisa M. Antonsen (mother) and Real Party In Interest Warren A. Antonsen (husband/presumed father) were married on January 9, 1990. The child whose paternity and custody are at issue, B, was born on March 2, 1990. On July 11, 1994, husband filed a petition for dissolution, naming B as a child of the marriage and requesting custody of B and another child common to the parties.

On February 27, 1995, Real Party in Interest Timothy M. Witt (putative father) filed a complaint for paternity, alleging that he was B's natural father, and seeking custody.[3] In the domestic relations action, Commissioner Patricia Shaler–Reed initially ruled on March 17, 1995, on motion of the state child support division, that paternity testing should proceed, but sought a post-hearing memorandum on this issue from husband, and allowed for a response from wife. Husband's post-hearing memorandum, filed April 4, 1995, stated:

1.  A.R.S. § 12–847(C) provides:
    The court, on its own motion, or *on motion of any party* to the proceedings, *shall order* the mother, her child or children and the alleged father to submit to the drawing of blood samples or the taking of deoxyribonucleic acid probe samples, or both, and shall direct that inherited characteristics, including but not limited to blood and tissue type, be determined by appropriate testing procedures. An expert duly qualified as an examiner of genetic markers shall be agreed upon by the parties or appointed by the court to analyze and interpret the results and report to the court.
    (Emphasis added.)

2.  Rule 35(a) provides:
    When the mental or physical condition (*including the blood group*) of a party, or of a person in the custody or under the legal con-

Pursuant to Commissioner Shaler–Reed's minute entry of March 17, 1995, please be advised that Petitioner has found no legal basis upon which to request that paternity testing not occur. Petitioner will not be filing further court pleadings requesting that such paternity testing not proceed.

Commissioner Shaler–Reed then entered the following order on April 25, 1995:

The Court having reviewed Respondent's Post–Hearing Memorandum, Rule 35 of the Arizona Rules of Civil Procedure, and the court file,

On the Court's own Motion, the Court having reconsidered its ruling of March 17, 1995 regarding the paternity testing,

THE COURT FINDS AS FOLLOWS:

(1) The minor child, [B], was conceived prior to the marriage and born during the term of the marriage.

(2) The child, [B], is presumptively the child of the marriage.

(3) *The Respondent's Motion for Paternity Testing fails to set forth the good cause required by Rule 35 of the Arizona Rules of Civil Procedure.*

IT IS THEREFORE ORDERED denying Respondent's Request for Paternity Testing.

(Emphasis added.) Three days later, Commissioner Shaler–Reed signed an "Order for Blood Test" prepared by an assistant attorney general in the child support division, ordering paternity testing at the state's ex-

trol of a party, is in controversy, the court in which the action is pending *may* order the party to submit to a physical or mental examination.... The order may be made *only on motion for good cause shown* and upon notice to the person to be examined and to all parties....
(Emphasis added.)

3.  Husband alleges, and the trial court apparently agreed, that mother "authored" the paternity complaint, which was filed under putative father's signature. We do not see any relevance to this allegation, as mother had standing to bring the paternity action on her own behalf, in any event. *See* A.R.S. § 12–843(A)(1). Furthermore, putative father has personally appeared and participated in the trial court proceedings.

pense, and directing that the results be admitted as evidence pursuant to A.R.S. section 12–847(D). On May 4, 1995, Judge *Pro Tem* Toby Maureen Gerst held a hearing in the domestic relations action on an order to show cause. At that hearing, Judge Gerst consolidated the paternity and dissolution actions, and further ordered:

> LET THE RECORD REFLECT that Commissioner Shaler–Reed signed an order requiring blood tests of Warren Antonsen, [the child] and Lisa Antonsen.
>
> IT IS FURTHER ORDERED that blood samples shall be drawn pursuant to that order and the results thereof shall be submitted to this Court on or before May 16, 1995.

Judge Gerst also quashed a temporary order of protection issued by Judge Yarnell at husband's request, and awarded temporary custody of the child to mother, ruling that the court would "enter permanent custody orders pending receipt of the blood test results," and that, if "Mr. Antonsen is not the natural father of the minor child, Mrs. Antonsen shall be awarded permanent custody." Judge Gerst also ruled that, because allegations of child abuse had been made, the case would be referred to DES "for a determination whether dependency proceedings should be initiated," with a report to the court filed by June 6, 1995. Supervised visitation between B and husband was later ordered.

Mother's and B's blood samples were collected on May 9, 1995, and husband's was collected on June 5, 1995, and the results were submitted to the trial court.

On September 21, 1995, in the domestic relations action, Judge Howe held a hearing on husband's motion *in limine* to exclude the paternity results as evidence in the dissolution action. Judge Joseph D. Howe, not fully informed how the blood testing occurred after Commissioner Shaler–Reed denied the motion, ruled as follows:

> The Court will continue its investigation of these matters by conference with all of the judges who have touched them and will determine whether the order for paternity testing was a mistake. *If the Court determines the order was a mistake, the paternity results will be sealed and the Court will set a hearing for custody, visitation and support of the child between Warren A. Antonsen and Lisa M. Antonsen. If the Court determines the paternity order was valid, the Court will consider the paternity results and may conclude that Mr. Antonsen has no further rights relating to the child; the Court will set a hearing in the Witt paternity matter to fix custody, visitation and support as between Timothy Witt and Lisa M. Antonsen.*

(Emphasis added.)

In the meantime, on August 22, 1995, mother filed a motion for paternity testing pursuant to A.R.S. section 12–847(C). In that motion, mother alleged (1) that husband was not the biological father of the child; (2) that the putative father was the only person with whom she engaged in sexual intercourse at the time of the child's conception; (3) that mother was not acquainted with husband nor married to him at the time of the child's conception; (4) that mother informed husband at the time she learned she was pregnant that the child was not his; and (5) that husband has acknowledged putative father's mother as the child's paternal grandmother. Mother argued that, under these circumstances, blood testing was required under A.R.S. section 12–847(C), and that "good cause" existed to order such testing. Mother's motion sought testing of herself, husband, the child, and the putative father, with the state to advance the costs and the nonparent to bear the costs after the results were received.

Husband filed several additional motions to vacate the prior orders that the blood tests be taken, and Judge Howe entered an extensive ruling on all pending motions on October 31, 1995. Judge Howe ruled the paternity test results "are ordered sealed and the same are ordered excluded from further consideration in these consolidated cases." He also denied both mother's and the state's pending motions for paternity testing in the paternity suit, after notating the following discussion:

> Commissioner Shaler–Reed has now vacated her order of April 28, 1995, as improvidently signed. It is evident from applicable bureaucratic procedures *du jour,*

with which counsel are familiar, that Commissioner Shaler–Reed's present decision was inevitable, and this judge joins Commissioner Shaler–Reed in wondering why the attorney general and counsel for the respondent continued to argue to this judge that the 4/28/95 order was valid.

This judge has conferred with Commissioner Gerst, who on May 4, 1995, ordered the paternity test relying on the now-vacated order of Commissioner Shaler–Reed. Commissioner Gerst has recused herself from further participation in this case, and indicated no desire to influence further proceedings in it.

This court now concludes that the Gerst order that the paternity test be taken was invalid, based on an order now vacated. Therefore, the Gerst order is ordered vacated. The results of the paternity test are ordered sealed and the same are ordered excluded from further consideration in these consolidated cases.

It is further ordered that the balance of Commissioner Gerst's order, relating to custody and visitation, is displaced by this court's order of August 4, 1995, on the same topic. Finally, to the extent the Gerst order projects that custody will be dependent upon the results of the now-suppressed paternity test, the order is vacated.

The court set a trial date of April 29, 1996, and dismissed any additional pending motions without prejudice to their substance being raised again at trial. Mother filed this special action on December 11, 1995. No stay of trial court proceedings has been sought or is necessary at this time.

## Discussion

### 1. *Special Action Jurisdiction*

■ An order regarding paternity testing is an interlocutory, non-appealable order, from which special action may be sought. *See, e.g., Ban v. Quigley,* 168 Ariz. 196, 197, 812 P.2d 1014, 1015 (App.1990) (mother sought relief from order that blood test be taken; court reasoned that "this case raises a matter of statewide importance and because we conclude that petitioners have no equally plain, speedy, or adequate remedy by direct appeal, we accept jurisdiction and grant relief"). Additionally, cases involving potential custody of young children are also often appropriate for special action relief to achieve a speedy resolution. *See, e.g., Olvera v. Superior Court,* 168 Ariz. 556, 815 P.2d 925 (App. 1991); *Marshall v. Superior Court,* 145 Ariz. 309, 701 P.2d 567 (1985); *Bechtel v. Rose,* 150 Ariz. 68, 71, 722 P.2d 236, 239 (1986) (even where challenged order was appealable, special action was proper because "we are dealing with the care and custody of a very young child and vigilant to protect his right to a suitable and speedy placement"); *see also Johnson v. Johnson,* 120 N.C.App. 1, 461 S.E.2d 369, 372 (1995) (although order compelling parties to submit to blood tests is not appealable, because it involved custody of a minor child, court would issue a writ of certiorari to review trial court's order).

■ On the other hand, similar cases have been decided on direct appeal from a final custody order or from a final paternity order. *See, e.g., Hughes v. Creighton,* 165 Ariz. 265, 798 P.2d 403 (App.1990) (appeal from visitation order in paternity action); *Williams v. Williams,* 166 Ariz. 260, 801 P.2d 495 (App. 1990) (husband challenged paternity testing on direct appeal in dissolution action); *R.A.J. v. L.B.V.,* 169 Ariz. 92, 817 P.2d 37 (App. 1991) (putative father challenged, on direct appeal, order vacating his paternity order). However, in our opinion, this case involves an error that would cause a potential reversal on direct appeal if a custody order were entered without regard to the paternity claim, and the child would suffer from a lack of a decision on the merits at this time, as well as from a significant delay from a decision awaiting direct appeal. Thus, the best interests of the child weigh in favor of accepting special action jurisdiction. Additionally, this is a pure issue of law not dependent on a more complete factual record, and an issue of first impression in Arizona. For these reasons, we accept special action jurisdiction.

### 2. *Merits*

Two issues are presented in this case. First, did the trial court abuse its discretion

in refusing mother's request for blood testing pursuant to A.R.S. section 12–847(C)? Second, did the trial court abuse its discretion by expressing an intention to refuse to consider the putative father's paternity claim in determining the custody of the child in the consolidated domestic relations action? We conclude that both rulings were an abuse of discretion.

## A. Relationship of Rule 35(a) and A.R.S. section 12–847(C)

█ Commissioner Shaler–Reed's ultimate decision to refuse to order blood testing was based on her conclusion that no "good cause" had been shown to justify compelling the parties to submit to a medical exam involving blood type grouping, as provided by Rule 35(a), Arizona Rules of Civil Procedure. Judge Howe's order denying mother's motion for blood testing implicitly adopts that finding. Mother contends that Rule 35(a), although perhaps properly applicable to the dissolution proceeding, has no application to a paternity action where A.R.S. section 12–847(C) compels a court to order paternity testing upon the motion of any party.

The application of Rule 35(a) to a paternity action appears to be an issue of first impression in Arizona. We have researched the considerable case law in other state courts that have addressed this issue, and we find that the cases fall into three general groups.

First, states that do *not* have a specific paternity testing statute requiring blood testing upon request of a party apply their analogous version of Rule 35(a) to paternity cases, requiring both "good cause" and notice to all parties, and leaving to the discretion of the trial court the decision whether to order testing. Those cases generally find "good cause" present to order testing under Rule 35(a) whenever one of the presumptive parents controverts paternity. *See D.D. v. C.L.D.*, 600 So.2d 265, 268 (Ala.Civ.App.1991) (trial court properly ordered blood testing

under Rule 35 in consolidated paternity/divorce actions where paternity of husband was at issue); *County of Hall ex rel. Tejral v. Antonson*, 231 Neb. 764, 437 N.W.2d 813, 816 (1989) (Rule 35 "good cause" was established for genetic testing in paternity action by movant's showing that paternity was controverted); *State ex rel. McGuire v. Howe*, 44 Wash.App. 559, 723 P.2d 452, 454 (1986) (mother's affidavit denying father's paternity established Rule 35 "good cause" to order blood test); *Younkin v. Younkin*, 221 Neb. 134, 375 N.W.2d 894, 899–900 (1985) (blood test to determine paternity was within purview of Rule 35 discovery and good cause shown by mother's allegation that husband was not child's father); *Blackwell v. State*, 475 So.2d 565, 567 (Ala.Civ.App.1985) (Rule 35 applied to paternity action to require blood test where husband disputed paternity); *Symonds v. Symonds*, 385 Mass. 540, 432 N.E.2d 700, 702 (1982) (Rule 35 allowed discretionary paternity blood testing even in absence of paternity statute declaring admissibility); *State ex rel. Ortloff v. Hanson*, 277 N.W.2d 205, 207 (Minn.1979) ("Minnesota does not have any statutory procedure specifically designed to meet the problem. Rule 35.01, Rules of Civil Procedure, does provide the court with authority to order a party to submit to a blood examination in an action in which the blood relationship of a party is in controversy, but we believe it would be helpful if the legislature would consider the entire matter of blood testing in the context of paternity actions")[4]; *Beck v. Beck*, 159 Ind. App. 20, 304 N.E.2d 541, 543 (3d Dist.1973) ("blood group" language in Rule 35(a) gives indirect support to admission of paternity testing); *State v. Summers*, 489 S.W.2d 225, 227–28 (Mo.App.1972) (in absence of statute regarding mandatory paternity testing, rule analogous to Rule 35 applied; failure to order testing reversible error where paternity was essential element in child support action). Under these authorities, even if the "good cause" requirement of Rule 35 applied

---

4. After the *Hanson* opinion, the Minnesota legislature did enact the following paternity testing statute:

The court may, and upon request of a party *shall*, require the child, mother, or alleged father to submit to blood tests or genetic tests,

or both. The tests shall be performed by a qualified expert appointed by the court.
Minn.Stat. 257.62, subd. 1 (1980) (emphasis added). This statute has been interpreted as mandatory. *Hennepin County Welfare Board v. Ayers*, 304 N.W.2d 879, 881 (Minn.1981).

in this paternity action, mother established good cause by her allegations that husband is not the father of the child.

A second group of cases involves jurisdictions that have adopted specific statutory provisions regarding paternity testing, all substantially similar to the language of A.R.S. section 12–847(C) that the court "shall" order genetic testing in a paternity action upon motion of any party, or on motion of a particular party, for example, a defendant. These states have found that the mandatory language in the paternity statute takes precedence over the discretion afforded a trial court generally under Rule 35(a), and makes such testing mandatory. Thus, a trial court has no discretion to deny a request for such a test in the presence of such a statute. *See Johnson v. Johnson,* 120 N.C.App. 1, 461 S.E.2d 369, 376 (1995) (G.S. § 8–50.1, requiring that "upon motion of the defendant, [the court] *shall* direct and order that the defendant, the mother and the child shall submit to a blood grouping test" presumes that paternity testing "will promote the interest and welfare of the child"); *Cooper v. Cooper,* 608 N.E.2d 1386, 1387 (Ind.App. 4th Dist.1993) (trial court required to order parties to submit to group blood testing under I.C. 31–6–6.1–8(a), which provides upon motion of any party, the court "shall" order such testing; "The use of the word 'shall' indicates that the trial court has no discretion in deciding to order the tests"); *Murdock v. Murdock,* 480 N.E.2d 243, 244 (Ind.App.1985) (same statute as in *Cooper* makes tests mandatory upon motion in a paternity case, and takes precedence, by implication, over the "good cause" requirement of Rule 35); *Crain v. Crain,* 104 Idaho 666, 662 P.2d 538, 542 (1983) (although trial court's order for testing was made pursuant to Rule 35(a), appellate court looked to specific paternity statute to conclude that tests were admissible); *Hennepin County Welfare Bd. v. Ayers,* 304 N.W.2d 879, 881 (Minn.1981) (paternity testing mandatory upon request of a party); *Beckwith v. Beckwith,* 355 A.2d 537, 544–45 (D.C.App.1976) (court's Rule 35(a) order for blood testing was justified under specific paternity statute, D.C.Code 1973, § 16–2343; "As § 16–2343 provides authority in this case for the court's order we need not reach the question of whether Rule 35 provides a basis for the court's order, as urged by appellee, nor need we consider appellant's numerous objections to the application of Rule 35 to this case").

One court within this second group of cases has found that its specific paternity testing statute is not inconsistent with Rule 35(a), but rather that the state legislature "had a reasonable basis for finding that 'existing law' in the form of [Rule 35] was inadequate in itself to cover all of the blood-testing situations in paternity proceedings and that it therefore was desirable to supplement it in order to plug any possible gaps." *Perry v. Commissioner ex rel. Kessinger,* 652 S.W.2d 655, 658 (Ky.1983). The *Perry* court found that Rule 35 continued to apply "to situations not covered by KRS 406.081 and in a manner consistent therewith." *Id.* at 659. Thus, that statute, which provided mandatory testing of mother and child upon motion of *defendant,* did not prevent the mother and child from moving the court under Rule 35 to order defendant to submit to testing on a showing of good cause. *Id.* The court reasoned that, in paternity cases, "[t]he necessity for the evidence and its unavailability from another source permit the showing of 'good cause' to be routinely made and accordingly, an order under [Rule 35] is virtually as automatically obtainable as one under [the mandatory paternity testing statute]." *Id.* at 660. The court thus found reversible error where the trial court had refused to order the defendant to submit to a blood test. *Id.* at 661.

A third group of cases arises from courts that deny paternity testing even under a specific paternity statute when the presumptive parents do not challenge paternity but a third party attempts to invade the established family structure. *See, e.g., Ban v. Quigley,* 168 Ariz. at 199, 812 P.2d at 1017; *McDaniels v. Carlson,* 108 Wash.2d 299, 738 P.2d 254 (1987); *C.C. v. A.B.,* 406 Mass. 679, 550 N.E.2d 365 (1990); *In re Marriage of Ross,* 245 Kan. 591, 783 P.2d 331 (1989). In such cases, a finding of "the best interests of the child" is required before ordering a paternity blood test, for the following reasons:

Arizona has a strong public policy of preserving the family unit when neither

the mother nor the mother's husband disavows the latter's paternity of the child. Because of that policy, we conclude that the trial court must specifically consider whether it would be in the best interest of the child for the case to proceed before a putative father may be permitted to seek blood tests in an attempt to rebut the presumption of the husband's paternity.

*Ban v. Quigley,* 168 Ariz. at 199, 812 P.2d at 1017; *see also Johnson,* 461 S.E.2d at 376 (Walters, J., dissenting, for excellent discussion of policy reasons to prevent third party from compelling paternity testing under mandatory statute when presumptive parents assert paternity in presumptive father). In Arizona, however, the "best interests of the child" cannot prevent mandatory paternity testing under A.R.S. section 12–847(C) because "the determination of the best interests of the child must be made separately, after the resolution of biological paternity," when the mother contests the presumptive father's paternity, and when the tests confirm the presumptive father is not biologically related to the child. *R.A.J. v. L.B.V.,* 169 Ariz. 92, 94–96, 817 P.2d 37, 39–41 (App. 1991). Thus, this line of cases preventing mandatory testing for policy reasons does not apply in this case where mother asserts that husband is not the biological father. Therefore, husband's contention that construing the "shall" language of A.R.S. section 12–847(C) as mandatory would compel tests "on the whim of any Tom, Dick, or Harry, who comes along requesting same, years after the birth of a child born to a marriage," is misplaced here, where mother contests husband's paternity and husband was not married to mother at the time of conception.

Under the reasoning of these cases, the trial court had no discretion in the present paternity action to deny a request for blood testing pursuant to A.R.S. section 12–847(C) by a mother contesting the husband/presumptive father's paternity. Similarly, even if A.R.S. section 12–847(C) had no application in the dissolution action, mother established "good cause" for such testing under Rule 35(a) by her allegations that husband is not the child's father.

Husband asserts that this result will lead to absurd situations. For example, he contends that any "stranger" could file a paternity petition and thereby force an established family to submit to paternity testing under the mandatory provisions of A.R.S. section 12–847(C). He argues that the "good cause" requirement of Rule 35(a) is inherently present in the paternity testing statute, so that the trial court had discretion to deny the motion despite the use of the statutory directive "shall."

We believe the legislature has defined "good cause" by its existing limitations provided in the paternity statutes. Section 12–847(C) requires paternity testing only upon motion of a "party to the proceedings" or upon the court's own motion. The category of "parties" is further restricted as follows:

1. The mother.

2. The father.

3. The guardian, conservator or best friend of a child or children born out of wedlock.

4. A public welfare official or agency of the county where the child or children reside or may be found.

5. The state pursuant to § 12–2456.

A.R.S. § 12–843(A). Thus, the legislature, by definitively narrowing the category of who can be a "party" to a paternity proceeding, has thereby implicitly determined who has "good cause" to request mandatory paternity testing pursuant to A.R.S. section 12–847(C). As mother's counsel pointed out at oral argument in this court, if a "stranger" attempts to obtain mandatory paternity testing in an action in which both presumptive parents assert paternity in the husband, the remedy is summary judgment. *See* Rule 56, Arizona Rules of Civil Procedure. We therefore reject husband's argument that our conclusion would lead to absurd results.

On the basis of the allegations made in mother's motion for blood testing, we conclude that the trial court had no discretion under A.R.S. section 12–847(C) to refuse to order the requested paternity testing. Alternatively, even under the provisions of Rule 35(a), to the extent that rule applies in the dissolution action and is not superseded by

the paternity statute, mother's allegations constituted good cause for such testing in any event. We thus conclude that the trial court abused its discretion in denying mother's motion for genetic blood testing. We therefore vacate that order and direct the trial court to grant mother's request for paternity testing pursuant to A.R.S. section 12–847(C), and to admit those results in the paternity action.

### B. Exclusion of Paternity Results in Dissolution Matters

■ The trial court in this case also expressed an intent to exclude the paternity results from any future child custody determination in the dissolution trial. However, the paternity petition has not been dismissed and the two actions continue to be consolidated.[5]

If the trial court determines, as a result of the blood tests being admitted, that husband is excluded as the biological father, it may not award custody or visitation of B to husband in the dissolution proceeding. Thus, the trial court's stated intention to consider husband as a potential custodian, without consideration of the putative father's claim to paternity, is an abuse of discretion.

■ A person who is neither a biological parent nor an adoptive parent does not have standing to commence a proceeding to establish custody of that child, except in circumstances not applicable to this case. See A.R.S. § 25–337. The mother's husband is a necessary party with standing to appear in a paternity proceeding only because of the legal presumption that a person married to the mother at the time of the child's conception and birth is the biological parent. R.A.J. v. L.B.V., 169 Ariz. 92, 817 P.2d 37 (App.1991). However, that presumption can be rebutted by clear and convincing evidence that the mother's husband is not the biological parent. State v. Mejia, 97 Ariz. 215, 399 P.2d 116 (1965). In this case, if the paternity testing

results should exclude husband as B's biological father, the legal presumption will have been rebutted.

Once a trial court determines that a presumed father is not either a biological or an adoptive parent of the child, it loses jurisdiction to make any award of custody or visitation to that person. Hughes v. Creighton, 165 Ariz. 265, 267–68, 798 P.2d 403, 405–06 (App.1990). Neither does a domestic relations court have authority to award custody or visitation to a nonparent when the child is in parental custody, A.R.S. section 25–337, except in those situations in which the legislature has specifically extended nonparental visitation rights. See, e.g., A.R.S. § 25–337.01 (noncustodial parents, grandparents, and great-grandparents); see also Olvera v. Superior Court, 168 Ariz. 556, 815 P.2d 925 (App.1991) (domestic relations court can award custody to nonparent only if child is not in physical custody of one of his parents). Husband would not be within any of these classifications if his only connection to the child is as a stepparent. See Finck v. O'Toole, 179 Ariz. 404, 407, 880 P.2d 624, 627 (1994) ("The legislature has not seen fit·to provide for visitation even with stepparents"). It therefore would be an abuse of discretion for the trial court to consider an award of custody to husband in the dissolution action without a consideration of the putative father's paternity claim.

For these reasons, we grant special action relief by directing the trial court to order the blood testing that mother requested pursuant to A.R.S. section 12–847(C), and to consider those results, subject to any foundational challenges by husband pursuant to A.R.S. section 12–847(D) and (E), in resolving the paternity issue and in the subsequent custody determination in the pending dissolution action.[6]

### Sanctions

Husband has requested sanctions for a frivolous special action, pursuant to Rule 4(f),

---

5. We reject husband's contention, made for the first time at oral argument, that Judge Howe's ruling implicitly "dismissed" the paternity action in its entirety.

6. The record indicates that some of this requested testing has already been done and the results

sealed by the court. The trial court may, in its discretion, order those results unsealed to prevent unnecessary duplicative testing at further expense of the parties or the state. This court has, by separate order, sealed all pleadings in this court that contain copies of those test results, pending the trial court's order otherwise.

Arizona Rules of Procedure for Special Actions. We deny this request for the following reasons: (1) because mother has prevailed, the petition was not frivolous; (2) Rule 4(f) does not provide a substantive basis for sanctions; and (3) no authority exists for an award of "double" sanctions because husband's counsel "was forced to forego a substantial part of his Christmas vacation" in preparing a response.

Jurisdiction accepted; relief granted.

WEISBERG and TOCI, JJ., concur.