SAMMY ROGER JOHNSON, JR., PLAINTIFF v. LISA McGHEE JOHNSON (MEEHAN), DEFENDANT AND LISA McGHEE JOHNSON (MEEHAN), PLAINTIFF v. THOMAS C. MEEHAN, DEFENDANT

No. 9411DC552

(Filed 5 September 1995)

**1. Evidence and Witnesses § 1920 (NCI4th); Illegitimate Children § 7 (NCI4th)— blood grouping tests—standing of defendant to request**

The putative father of a child born to defendant mother during her marriage to plaintiff was an "interested party" within the meaning of N.C.G.S. § 8-50.1(b) and as such could move the trial court to order blood grouping tests to establish or disprove parentage, since the mother filed a separate action against the putative father to compel him to submit to blood grouping tests; her action was consolidated with plaintiff husband's original action against the mother for temporary custody of the minor child; and the putative father filed an acknowledgment of paternity.

**Am Jur 2d, Illegitimate Children § 27.**

**Admissibility and weight of blood-grouping tests in disputed paternity cases. 43 ALR4th 579.**

**Admissibility or compellability of blood test to establish testee's nonpaternity for purpose of challenging testee's parental rights. 87 ALR4th 572.**

1

JOHNSON v. JOHNSON

[120 N.C. App. 1 (1995)]

2. **Illegitimate Children § 7 (NCI4th)— presumption of legitimacy of child—blood grouping tests admissible to rebut presumption**

When the question of paternity arises, N.C.G.S. § 8-50.1 allows the results of blood grouping tests to be used to rebut any presumptions of paternity in both criminal and civil actions. In this case, the putative father, who is now married to the mother, presented other facts and circumstances sufficient to question the presumption that the child in question, though born during the mother's marriage to plaintiff, was legitimate, where the putative father and the mother both filed acknowledgments of paternity of the minor child; while plaintiff husband was absent in Saudi Arabia for a six-month period ending 15 March 1991, the mother had intercourse with the putative father on numerous occasions; the mother did not have intercourse with anyone else during that period; when plaintiff husband returned 15 March 1991, he and the mother had intercourse on at least one occasion; the husband and the mother had been trying unsuccessfully to conceive a child for at least one year prior to the husband's leaving for Saudi Arabia; and the mother learned she was pregnant in early April 1991.

**Am Jur 2d, Illegitimate Children § 27.**

**Admissibility and weight of blood-grouping tests in disputed paternity cases. 43 ALR4th 579.**

**Admissibility or compellability of blood test to establish testee's nonpaternity for purpose of challenging testee's parental rights. 87 ALR4th 572.**

3. **Evidence and Witnesses § 1920 (NCI4th); Illegitimate Children § 7 (NCI4th)— "alleged parent defendant"— applicability to presumed father-husband—husband compelled to submit to blood grouping tests**

The term "alleged parent defendant" may apply to a presumed father-husband as well as a third party putative father; therefore, plaintiff husband could be compelled to submit to blood grouping tests under N.C.G.S. § 8-50.1(b), as he was the named defendant in the mother's counterclaim and in the paramour's crossclaim, and the husband alleged in his own complaint that he was the parent of the child.

**Am Jur 2d, Illegitimate Children § 27.**

JOHNSON v. JOHNSON

[120 N.C. App. 1 (1995)]

**Admissibility or compellability of blood test to establish testee's nonpaternity for purpose of challenging testee's parental rights. 87 ALR4th 572.**

**4. Divorce and Separation § 350 (NCI4th)— custody action— blood grouping tests to determine paternity—best interests of child served by test**

In the context of a proceeding to award custody of a minor child, an order compelling the parties to submit to blood grouping and DNA testing to determine paternity will best promote the interests and welfare of the child.

**Am Jur 2d, Divorce and Separation § 974.**

**Right of putative father to custody of illegitimate child. 45 ALR3d 216.**

**Admissibility or compellability of blood test to establish testee's nonpaternity for purpose of challenging testee's parental rights. 87 ALR4th 572.**

Judge WALKER dissenting.

Appeal by plaintiff Sammy Roger Johnson, Jr., from order entered 19 January 1994 by Judge Franklin F. Lanier in Johnston County District Court. Heard in the Court of Appeals 21 February 1995.

Plaintiff Sammy Roger Johnson (hereinafter Mr. Johnson) appeals from an order granting defendant Thomas C. Meehan's motion to compel Mr. Johnson to submit to blood-grouping and DNA testing pursuant to G.S. 8-50.1. Mr. Johnson and defendant Lisa McGhee Johnson (hereinafter Mrs. Meehan) were married on 22 October 1988. On 1 December 1991, Mrs. Meehan gave birth to a baby girl, Samantha Renee Johnson. Samantha's birth certificate listed Mr. Johnson and Mrs. Meehan as parents.

The parties were separated on 8 August 1992. On 6 July 1992, Mr. Johnson filed a complaint seeking divorce from bed and board and temporary custody of the minor child. Mrs. Meehan answered and counterclaimed for child custody, support and paternity determination. Mrs. Meehan alleged that Mr. Johnson was not the natural father of the minor child and requested the trial court to order Mr. Johnson, Mrs. Meehan and the minor child to submit to blood testing pursuant to G.S. 8-50.1(b) for the purpose of establishing or disproving parentage.

JOHNSON v. JOHNSON

[120 N.C. App. 1 (1995)]

On 27 August 1992, Mrs. Meehan filed a separate action against Thomas C. Meehan alleging that defendant Meehan was the father of her minor child and moved for an order that defendant Meehan, the minor child and Mrs. Meehan submit to blood group testing pursuant to G.S. 8-50.1(b). On 31 August 1992, Mr. Meehan filed an Acknowledgment of Paternity, alleging that he was the natural, biological father of Samantha Renee Johnson. On 9 October 1992, Mrs. Meehan moved the court to require Mr. Johnson to submit to blood-grouping testing pursuant to G.S. 8-50.1.

On 7 October 1992, the trial court consolidated Mr. Johnson's original action and Mrs. Meehan's action for blood testing. On 22 October 1992, the trial court entered an order denying Mrs. Meehan's motion to order Mr. Johnson to submit to blood-grouping testing pursuant to G.S. 8-50.1(b). Although Mr. Meehan was a party to the action prior to the hearing on Mrs. Meehan's motion, Mr. Meehan was not served by either party and did not attend the hearing or present evidence. On 19 November 1992, pursuant to Rules 59 and 60 of the North Carolina Rules of Civil Procedure, Mr. Meehan moved for a new trial and relief from the 22 October 1992 Order. On 10 November 1993, the trial court granted Mr. Meehan's motion for a new trial and relief from the 22 October 1992 Order.

On 19 January 1994, the trial court entered the following order compelling all parties, including Mr. Johnson, to submit to blood-grouping and DNA testing pursuant to G.S. 8-50.1:

FINDINGS OF FACT

. . . .

5. In addition to the issues of custody and support of Samantha Johnson, this action involves the issue of paternity in that Thomas C. Meehan and Lisa McGhee Johnson (Meehan) contend that Thomas C. Meehan is the biological father of the child. Sammy Roger Johnson contends that he is the biological father of the child. The paternity issue is pending for later determination.

6. Sammy Roger Johnson, Jr. filed an action for, among other things, child custody, against Mrs. Meehan on July 6, 1992. Thereafter, on August 3, 1992, Mrs. Meehan filed an Answer and Counterclaim against Mr. Johnson. In her Counterclaim, Mrs. Meehan asserted a claim for custody and a claim requesting the court to determine the paternity of Samantha Renee Johnson. On August 17, 1992, Mrs. Meehan filed a separate action in file num-

JOHNSON v. JOHNSON

[120 N.C. App. 1 (1995)]

ber 92 CVD 1631, for a determination of the paternity of Samantha Renee Johnson. The two cases (92 CVD 1258 and 92 CVD 1631) were consolidated by Order of this court on October 7, 1992, making Mr. Meehan a party to both actions. Mr. Meehan filed a Crossclaim against Mr. Johnson for a determination of paternity.

7. On 21 October 1992, a hearing was held on Lisa McGhee Johnson's Motion for Blood Testing and/or Physical Examination. The Honorable O. Henry Willis, Jr. entered an order denying this motion.

8. Although Mr. Meehan was a party to this action prior to the hearing on 21 October 1992, he was not served by either Sammy Roger Johnson, Jr. or Lisa McGhee Johnson or their attorneys with notice of the hearing held on 21 October 1992. Mr. Meehan did not attend the hearing or present any evidence and was not represented by counsel at the hearing. On or about 10 November 1993, an Order was entered by the undersigned granting Thomas Meehan's Motion for New Trial.

9. Sammy Roger Johnson was out of the United States in Saudi Arabia for a six (6) month period ending on 15 March 1991. During February 1991, Lisa Johnson (Meehan) had sexual intercourse with Thomas Meehan approximately twenty (20) times. Lisa testified that in February 1991, she did not have sexual intercourse with anyone other than Thomas Meehan. From 1 March 1991 until 15 March 1991, Lisa Johnson Meehan had sexual intercourse with Thomas Meehan approximately ten (10) times. From 1 March 1991 until 15 March 1993, Lisa Johnson (Meehan) did not have sexual intercourse with anyone other than Thomas Meehan.

10. Sammy Roger Johnson returned to the United States on 15 March 1991 and he and Lisa Johnson (Meehan) had sexual intercourse at least one time on this occasion.

11. Lisa Johnson (Meehan) and Thomas Meehan testified that they have married and have a daughter named Amanda Meehan, born 5 August 1993, who is the sister of the child Samantha Johnson. Amanda was born twelve months after Mr. Johnson and Mrs. Meehan separated from one another. Sammy Johnson testified that he is not the father of Amanda Meehan. However, Sammy Roger Johnson's name appears on Amanda Meehan's birth certificate, since he was still married to Lisa Johnson on Amanda's date of birth.

12. On or about 7 March 1992, Lisa Johnson (Meehan) told Sammy Roger Johnson that she had an affair with Thomas Meehan and that Sammy Roger Johnson was not the biological father of Samantha Renee Johnson.

13. Sammy Roger Johnson testified that Mrs. Meehan told him that he was not the biological father of Samantha Renee Johnson, but that she did not know who was the biological father.

14. Mrs. Meehan and Mr. Meehan have both submitted to blood and DNA testing in September 1992. The results of these tests were offered into evidence by Mr. Meehan at this hearing, but were not admitted into evidence by the court, and were neither available or ready at the time this court heard Mrs. Meehan's Motion for Blood Testing and/or Physical Examination on October 7, 1992, in File Number 92 CVD 1258.

15. For a period of at least one (1) year before Sammy Roger Johnson left for Saudi Arabia, he and Lisa Johnson (Meehan) had sexual intercourse without any contraception and had not conceived. The question of their ability to conceive and have a child arose before Sammy Johnson left for Saudi Arabia and he went for infertility testing to see if he had a problem.

16. The Court considered the information contained in Meehan's Exhibit 6.

17. Mrs. Meehan first learned that she was pregnant with Samantha Renee Johnson in or around early April, 1991. She had begun having morning sickness at that time, and she missed her monthly menstrual period. Mrs. Meehan went to the doctor in April, 1991, and her pregnancy was confirmed at that time. Samantha Renee Johnson was born on December 1, 1991, was a full-term baby, and was not born prematurely.

18. Mrs. Meehan testified that she believes that Mr. Meehan is the father of Samantha Renee Johnson. Mr. Meehan testified that he believes that he is the father of Samantha Renee Johnson. Mr. Johnson testified that he believes that he is the father of Samantha Renee Johnson.

19. Although Mrs. Meehan and Mr. Meehan, through their attorneys of record request to the court to grant Mr. Meehan's Motion for DNA and Blood Testing pursuant to both N.C.G.S. 8-50.1 and Rule 35 of the North Carolina Rules of Civil Procedure,

JOHNSON v. JOHNSON

[120 N.C. App. 1 (1995)]

the Court finds that the Motion should be allowed only pursuant to N.C.G.S. 8-50.1.

20. There has been good cause shown for the granting of Mr. Meehan's Motion for Blood Testing.

Based upon the foregoing Findings of Fact, the Court makes the following:

CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action.

2. This matter is properly before the court and all parties have received proper notice of the hearing.

3. The issue of paternity has been properly raised and pled by Mrs. Meehan in her Counterclaim and by Mr. Meehan in his Crossclaim filed in these actions.

4. Sammy Roger Johnson is an "alleged-parent defendant" by virtue of the counterclaim and crossclaim filed against him by Lisa Johnson (Meehan) and Thomas Meehan.

5. Mr. Meehan's Motion for Blood and DNA Testing should be granted, pursuant to N.C.G.S. 8-50.1.

6. There has been good cause shown for the granting of Mr. Meehan's Motion for Blood Testing.

7. Sammy Roger Johnson, Jr., Lisa McGhee Johnson Meehan, and Thomas C. Meehan are all parties to this action in which their physical conditions and blood groupings are in controversy. Samantha Renee Johnson is a child in the custody of a party or parties to this action, and her physical condition, including her blood grouping, is in controversy.

It is therefore ORDERED as follows:

1. All parties are ordered to submit themselves to Roche Biomedical Laboratory, 1643-A Owen Drive, Fayetteville, North Carolina (1-800-726-7624) for DNA and Blood Grouping testing, within forty five (45) days from entry of this Order on 19 January 1994. Sammy Roger Johnson, Jr. and Lisa McGhee Johnson Meehan, who have temporary joint custody, without prejudice, of Samantha Renee Johnson, are ordered to and shall submit Samantha Renee Johnson to Roche Biomedical Laboratory,

JOHNSON v. JOHNSON

[120 N.C. App. 1 (1995)]

1643-A Owen Drive, Fayetteville, NC, for DNA testing and Blood Grouping testing within forty five (45) days from entry of this Order on 19 January 1994. The results of the tests are to be submitted to the attorneys for all of the parties in this action by Roche Biomedical Laboratory within thirty days after the testing occurs. . . .

2. Thomas C. Meehan shall pay all costs associated with the DNA and Blood testing ordered herein.

Mr. Johnson appeals.

*Mast, Morris, Schulz & Mast, P.A., by George B. Mast, Bradley N. Schulz and Christi C. Stem, for plaintiff-appellant.*

*Edward P. Hausle, P.A., by Edward P. Hausle, for defendant-appellee Meehan.*

EAGLES, Judge.

Mr. Johnson appeals the trial court's order compelling him to submit to blood-grouping and DNA testing pursuant to G.S. 8-50.1(b). After careful review, we affirm.

I.

We note initially that "[a] court order requiring parties and their minor child to submit to bloodgrouping testing does not affect a substantial right and is, therefore, interlocutory and not [immediately] appealable." *State Ex Rel. Hill v. Manning,* 110 N.C. App. 770, 772, 431 S.E.2d 207, 208 (1993). However, this Court may issue a writ of certiorari to review a trial court's order " 'when no right of appeal from an interlocutory order exists.' " *Stone v. Martin,* 69 N.C. App. 650, 652, 318 S.E.2d 108, 110 (1984), *quoting* N.C. R. App. P. 21(a)(1). We choose to treat Mr. Johnson's interlocutory appeal as a petition for writ of certiorari and address the merits.

II.

[1] Mr. Johnson first contends that Mr. Meehan has no standing to move for blood-grouping tests under G.S. 8-50.1(b). We disagree. Mr. Johnson cites the United States Supreme Court's decision in *Michael H. v. Gerald D.,* 491 U.S. 110, 105 L.Ed.2d 91 (1989), as authority for the proposition that a third-party, such as Mr. Meehan, has no standing to compel the husband of the biological mother to submit to a

blood test to establish or disprove the paternity of a child born during the marriage. We find *Michael H.* inapposite. *Michael H.* involved the constitutionality of a California statute which prohibited a third party from seeking parental rights of a child born during the marriage of the biological mother to another man. The California statute at issue in *Michael H.* provided that " 'the issue of a wife cohabiting with her husband, who is not impotent or sterile, is *conclusively presumed* to be a child of the marriage.' " *Michael H.*, 491 U.S. at 115, 105 L.Ed.2d at 101, *quoting* Cal. Evid. Code Ann. § 621(a) (West Supp. 1989) (emphasis added). The statute further provided explicitly that only the husband or wife could move for blood tests to determine paternity and then only within two years of the child's birth. *Michael H.*, 491 U.S. at 115, 105 L.Ed.2d at 101, citing Cal. Evid. Code Ann. §§ 621 (c) & (d). The Supreme Court held that the California statute did not deny third parties any substantive due process right to establish a parental relationship with the child. The Court did not hold that a putative father never has standing to challenge the marital presumption of legitimacy. Rather, the Court there held that states could place limits on such challenges.

The California statute at issue in *Michael H.* is far more restrictive than the North Carolina statute at issue here, G.S. 8-50.1(b). It provides in pertinent part:

> (b) In the trial of any civil action in which the question of parentage arises, the court before whom the matter may be brought, upon motion of the plaintiff, alleged-parent defendant, or other interested party, shall order that the alleged-parent defendant, the known natural parent, and the child submit to any blood tests and comparisons which have been developed and adapted for purposes of establishing or disproving parentage.

Here, Mr. Meehan is an "interested party" under the statute. Mrs. Meehan filed a separate action against Mr. Meehan to compel Mr. Meehan to submit to blood-grouping tests pursuant to G.S. 8-50.1(b) to establish or disprove parentage. Mrs. Meehan's action against Mr. Meehan was consolidated with Mr. Johnson's original action against Mrs. Meehan for temporary custody of the minor child. Mrs. Meehan and Mr. Meehan have both filed acknowledgments of paternity. Under these facts, Mr. Meehan is clearly an "interested party" within the meaning of the statute and as such may move the trial court to order blood-grouping tests.

III.

**[2]** Mr. Johnson further argues that the minor child was born during his marriage to Mrs. Meehan and is presumed to be legitimate. Mr. Johnson further argues that Mr. Meehan has no standing to rebut the marital presumption and that G.S. 8-50.1 should not be construed to confer standing to Mr. Meehan to challenge this presumption. We disagree. In *Eubanks v. Eubanks*, 273 N.C. 189, 159 S.E.2d 562 (1968), our Supreme Court stated:

> When a child is born in wedlock, the law presumes it to be legitimate, and this presumption can be rebutted only by facts and circumstances which show that the husband could not have been the father, as that he was impotent or could not have had access to his wife.

*Id.* at 197, 159 S.E.2d at 568. The presumption that a child born during the marriage is legitimate is a *rebuttable* presumption. *Eubanks*, 273 N.C. at 189, 159 S.E.2d at 562. It may be rebutted "only by facts and circumstances which show that the husband could not have been the father, *as that* he was impotent or could not have had access to his wife." *Id.* (emphasis added). As our Supreme Court further explained in *Wright v. Wright*, 281 N.C. 159, 188 S.E.2d 317 (1972), "[i]mpotency and nonaccess are set out therein [in *Eubanks*] as *examples* of types of evidence that would 'show that the husband could not have been the father.' " *Id.* at 171, 188 S.E.2d at 325.

In *Wright, supra,* plaintiff-wife instituted an action against defendant-husband for alimony *pendente lite,* custody of and support for her minor child. *Wright,* 281 N.C. at 160, 188 S.E.2d at 318. Defendant-husband answered and admitted that the minor child was "entitled to support from him, regardless of the court's decision relative to custody of the said child." Plaintiff-wife, however, objected to thirty interrogatories submitted to her by Mr. Wright which called for her to answer detailed questions concerning whether plaintiff-wife was having an adulterous affair at the time of the minor child's conception. *Id.* at 161, 188 S.E.2d at 319. The trial court then allowed defendant-husband's motion that plaintiff-wife, defendant-husband and the minor child submit to blood-grouping tests pursuant to G.S. 8-50.1. *Id.* This Court reversed the trial court's order requiring the parties to submit to blood-grouping tests. *Id.* at 163, 188 S.E.2d at 320.

Our Supreme Court reversed and held that defendant-husband was entitled to have the order for blood-grouping tests. *Id.* at 173, 188

S.E.2d at 326. At the time of the Court's decision in *Wright*, G.S. 8-50.1 provided:

> Competency of evidence of blood tests.—In the trial of any criminal action or proceedings in any court in which the question of paternity arises, *regardless of any presumptions with respect to paternity*, the court before whom the matter may be brought, upon motion of the defendant, shall direct and order that the defendant, the mother and the child shall submit to a blood grouping test . . . . *Such evidence shall be competent to rebut any presumptions of paternity.*
>
> In the trial of any civil action, the court before whom the matter may be brought, upon motion of either party, shall direct and order that the defendant, the plaintiff, the mother and the child shall submit to a blood grouping test; provided, that the court, in its discretion, may require the person requesting the blood grouping test to pay the cost thereof. The results of such blood grouping tests shall be admitted in evidence when offered by a duly licensed practicing physician or other duly qualified person.

*Wright*, 281 N.C. at 168-69, 188 S.E.2d at 323-24. Although the first paragraph of G.S. 8-50.1 authorizing the trial court to order bloodgrouping tests "regardless of any presumptions with respect to paternity" arguably could have been read to apply only in criminal actions in which the question of paternity arose, the Supreme Court stated:

> [W]e are of opinion and hold that in both criminal and civil actions in which the question of paternity arises, the results of such blood-grouping tests must be admitted in evidence when offered by a duly licensed practicing physician or other qualified person, "regardless of any presumptions with respect to paternity," and that "[s]uch evidence shall be competent to rebut any presumptions of paternity."

*Id.* at 170, 188 S.E.2d at 324. The Court further concluded that, "[a]ssuming the blood-grouping tests are made and offered in evidence by qualified persons, the results thereof, if they tend to exclude defendant as the father of the child, may be offered in evidence to rebut the common-law presumption of legitimacy." *Id.* at 172, 188 S.E.2d at 326.

Here, Mr. Meehan has presented "other facts and circumstances" sufficient to question the presumption that the child, though born during the marriage, is legitimate. Mr. Meehan and Mrs. Meehan have

**JOHNSON v. JOHNSON**

[120 N.C. App. 1 (1995)]

both filed acknowledgments of paternity of the minor child. In the trial court's 19 January 1994 Order compelling the parties to submit to blood-grouping tests, the trial court found that while Mr. Johnson was absent in Saudi Arabia for a six month period ending 15 March 1991, Mrs. Meehan had sexual intercourse with Mr. Meehan on numerous occasions. Mrs. Meehan did not have sexual intercourse with anyone else during that period. When Mr. Johnson returned 15 March 1991, Mr. Johnson and Mrs. Meehan had sexual intercourse on at least one occasion. Mr. Johnson and Mrs. Meehan had been trying unsuccessfully to conceive a child for at least one year prior to Mr. Johnson leaving for Saudi Arabia. Mrs. Meehan learned that she was pregnant in early April 1991.

Mr. Johnson did not assign error to any of these findings of fact and there is competent evidence in the record to support each of them. The factual findings are sufficient "other facts and circumstances" to challenge the presumption of legitimacy. Based on our Supreme Court's holding in *Wright v. Wright*, 281 N.C. at 170, 188 S.E.2d at 324, we conclude that when the question of paternity arises, G.S. 8-50.1 allows the results of blood-grouping tests to be used to rebut any presumptions of paternity in both criminal and civil actions.

IV.

[3] Mr. Johnson next contends that he cannot be compelled to submit to blood-grouping tests because under G.S. 8-50.1(b) only "the alleged-parent defendant, the known natural parent, and the child" can be ordered to submit to blood-grouping tests. Mr. Johnson argues that as the "presumed father-husband," he cannot be the "alleged-parent defendant." We disagree. From the pleadings, it is clear that Mr. Johnson is the named defendant in Mrs. Meehan's counterclaim and in Mr. Meehan's crossclaim. Mr. Johnson has alleged in his own complaint that he is the parent of the child. Accordingly, Mr. Johnson is an "alleged-parent defendant" as determined by the trial court in its conclusions of law and is subject to being required to submit to blood-grouping tests. The trial court concluded that "good cause" had been shown for the granting of Mr. Meehan's motion for blood-grouping tests and therefore ordered all the parties to submit to DNA and blood-grouping testing that would provide to the court the most dependable evidence available to determine paternity.

In *Ban v. Quigley*, 812 P.2d 1014 (Ariz. Ct. App. 1990) the Arizona Court of Appeals rejected the petitioners' argument that the word

**JOHNSON v. JOHNSON**

[120 N.C. App. 1 (1995)]

"father" in a statute allowing the mother, father or guardian of the child to bring paternity actions was meant to include only the presumptive father-husband as opposed to the putative father. The Court held that the term "father" was "intended to mean the putative father, presumed or otherwise." *Quigley*, 812 P.2d at 1017. We likewise conclude that the term "alleged-parent defendant" may apply to a presumed father-husband as well as a third party putative father.

V.

[4] Finally, Mr. Johnson contends that allowing Mr. Meehan to rebut the marital presumption of legitimacy by compelling Mr. Johnson to submit to blood-grouping tests pursuant to G.S. 8-50.1(b) would violate public policy and would not be in the child's best interest. The trial court's order compelling Mr. Johnson to submit to DNA and blood-grouping tests to determine paternity arose in the context of deciding whether Mr. Johnson or Mrs. Meehan should have temporary custody of the minor child pending the parties' divorce proceeding. An order awarding custody of a minor child should award custody to the person that "will best promote the interest and welfare of the child." G.S. 50-13.2. " '[T]he welfare of the child is the paramount consideration to which all other factors, including common law preferential rights of the parents, must be deferred or subordinated.' " *Surles v. Surles*, 113 N.C. App. 32, 37, 437 S.E.2d 661, 663 (1993) (quoting *Plemmons v. Stiles*, 65 N.C. App. 341, 345, 309 S.E.2d 504, 506 (1983)). Evidence of paternity may be considered in determining what is in the child's best interest. *Surles*, 113 N.C. App. at 36, 437 S.E.2d at 663. We also note that in those jurisdictions that allow a putative father to bring a paternity action to establish the paternity of a child born during the marriage of the biological mother to another man, the trial courts are required to consider whether allowing the putative father to assert paternity and seek blood-grouping tests in an attempt to prove or disprove his paternity would be in the child's best interest. In *Ban v. Quigley*, 812 P.2d 1014 (Ariz. Ct. App. 1990), the Court of Appeals of Arizona held:

> Arizona has a strong public policy of preserving the family unit when neither the mother nor the mother's husband disavows the latter's paternity of the child. Because of that policy, we conclude that the trial court must specifically consider whether it would be in the best interests of the child for the case to proceed before a putative father may be permitted to seek blood tests in an attempt to rebut the presumption of the husband's paternity.

*Id.* at 1017. Washington, Massachusetts, Maryland and Kansas all have similar requirements that the trial court first consider whether ordering the blood tests and the potential impact of the results will be in the child's best interest. *See McDaniels v. Carlson*, 738 P.2d 254 (Wash. 1987); *C.C. v. A.B.*, 550 N.E.2d 365 (Mass., 1990); *Turner v. Whisted*, 607 A.2d 935 (Md. 1992); *In re Marriage of Ross*, 783 P.2d 331 (Kan. 1990). For these reasons, we conclude that in the context of a proceeding to award custody of a minor child, an order compelling the parties to submit to blood-grouping and DNA testing to determine paternity "will best promote the interest and welfare of the child." G.S. 50-13.2. Accordingly, we affirm the trial court's order compelling Mr. Johnson to submit to blood-grouping and DNA testing pursuant to G.S. 8-50.1(b).

Affirmed.

Judge McGEE concurs.

Judge WALKER dissents.

Judge WALKER dissenting.

The legal issue presented is a narrow one: Does the language of N.C. Gen. Stat. § 8-50.1 in effect when this action originated confer standing upon an alleged natural parent such as Mr. Meehan to compel a presumed father such as Mr. Johnson to submit to a blood test to determine the paternity of a child born during the marriage of the presumed father to the natural mother? A careful review of the statute and the arguments of the parties in this case leads me to conclude that it does not. I must therefore respectfully dissent from the majority's holding.

I.

I believe that the resolution of this issue must begin with an examination of the marital presumption and its applicability to the present case. The marital presumption has been expressed as follows:

When a child is born in wedlock, the law presumes it to be legitimate, and this presumption can be rebutted only by facts and circumstances which show that the husband could not have been the father, as that he was impotent or could not have had access to his wife.

*Eubanks v. Eubanks*, 273 N.C. 189, 197, 159 S.E.2d 562, 568 (1968) (citations omitted); *see also In re Legitimation of Locklear*, 314 N.C. 412, 419, 334 S.E.2d 46, 51 (1985). "This rebuttable presumption of legitimacy of a child born to a married woman 'is one of great antiquity, and, doubtless [was applied] to avoid the serious disabilities attaching to the status of illegitimacy . . . .' " *Locklear*, 314 N.C. at 419, 334 S.E.2d at 51 (*quoting* 10 Am. Jur. 2d *Bastards* § 11, at 852 (1963)). The presumption "is universally recognized and considered one of the strongest known to the law." *Id.* Our Supreme Court has recognized the continuing validity of the marital presumption:

> There is strong public policy supporting this presumption. The law, as it ought, favors the legitimacy of children. Children of a married woman ought to be, and almost always are in fact, fathered by her husband. The presumption recognizes this. It presumes and promotes the integrity of the family—the seminal unit of society as we know it.

*State v. White*, 300 N.C. 494, 508, 268 S.E.2d 481, 490 (1980); *see also L.C. v. T.L.*, 870 P.2d 374, 380 (Wyo.) (citation omitted) (" 'the presumption of legitimacy is . . . based on an overriding social policy derived from the relationship of a presumed father and the child at the time of birth' "), *cert. denied, Lawrence C. v. Timothy L.*, —— U.S. ——, 130 L. Ed. 2d 127 (1994).

Since Samantha was born during the marriage of Lisa Johnson and Sammy Johnson, the marital presumption clearly applies here, and I agree with the majority's opinion to the extent it implicitly rejects Mr. Meehan's argument to the contrary. However, I cannot agree with the majority's conclusion that, under the facts of this case, N.C. Gen. Stat. § 8-50.1 allows Mr. Meehan to rebut the presumption by compelling Mr. Johnson to submit to blood tests which allegedly would show that Mr. Johnson cannot be Samantha's father.

## II.

I acknowledge that this State has long recognized that the marital presumption is rebuttable by evidence of non-access, impotence, or other circumstances tending to show that the mother's husband could not be the father. *Eubanks*, 273 N.C. at 197, 159 S.E.2d at 568; *Locklear*, 314 N.C. at 419, 334 S.E.2d at 51. The majority, perhaps recognizing that Mr. Meehan's evidence is insufficient to *rebut* the presumption, nonetheless concludes that "Mr. Meehan has presented

'other facts and circumstances' sufficient to question the presumption that the child, though born during the marriage, is legitimate."

The majority first notes that both Mr. Meehan and Ms. Meehan have filed acknowledgements of paternity of the minor child. I have found no authority for the proposition that self-serving acknowledgements of paternity by a natural mother and putative father, standing alone, constitute evidence sufficient to rebut the marital presumption. Perhaps recognizing this, the majority goes on to note that the trial court in its 19 January 1994 order found that during Mr. Johnson's six-month tour of duty in Saudi Arabia, which ended on 15 March 1991, Ms. Meehan had sexual intercourse with Mr. Meehan on numerous occasions; that she did not have sexual intercourse with anyone else during that period; that Mr. Johnson and Ms. Meehan had sexual intercourse at least once upon his return on 15 March 1991; and that Mr. Johnson and Ms. Meehan had been trying unsuccessfully to conceive a child for at least a year prior to Mr. Johnson's absence. The majority points out that Mr. Johnson did not assign error to any of these findings. However, he did object and except to entry of the court's order; by doing so, he preserved for review the question of whether the court's findings supported its conclusions of law and its order. *See Morris v. Morris*, 90 N.C. App. 94, 97, 367 S.E.2d 408, 410 (1988) (where appellant's only exception and assignment of error is to trial court's entry of judgment, reviewing court may determine whether findings of fact support conclusions of law and judgment entered thereon).

The record contains facts not mentioned by the majority which, in my opinion, should have been considered in the majority's determination that Mr. Meehan presented "other facts and circumstances" sufficient to question the presumption of legitimacy. For example, Mr. Johnson testified that when he went for infertility testing after he and Lisa Johnson had tried unsuccessfully to conceive a child, the results of his sperm count test were inconclusive and did not show that he had a fertility problem. He also testified that upon his return from Saudi Arabia on 15 March 1991, he and Lisa Johnson had sexual relations on that day and regularly for two weeks thereafter.

The majority recites the trial court's findings that Lisa Johnson and Sammy Johnson resumed their sexual relationship on 15 March 1991 and that Samantha was born "full-term" on 1 December 1991, implying that Samantha's conception had to have occurred prior to 15 March 1991. The duration of a human pregnancy is 280 days, with a

standard deviation of 14 days. *Obstetrics: Normal and Problem Pregnancies* 229 (Stephen G. Gabbe, M.D. et al. eds., 2d ed. 1991). However, "[t]he time when conception could have occurred will vary from case to case," and "whether a particular pregnancy could have extended for a longer or shorter period may be a proper subject for expert medical opinion." *State v. White*, 300 N.C. at 510, 268 S.E.2d at 491. No expert medical testimony was presented in this case, and in the absence of such testimony no inference regarding the possible date of Samantha's conception may be drawn from the evidence.

I am concerned that the majority is formulating a threshhold showing that must be made by someone such as Mr. Meehan in order to have standing to move for blood tests under N.C. Gen. Stat. § 8-50.1 in spite of the marital presumption. However, just what must be shown is unclear from the majority's opinion. For example, suppose that in the instant case there was no evidence regarding the Johnsons' inability to conceive a child prior to Mr. Johnson's departure for Saudi Arabia or suppose that Mr. Johnson had returned from Saudi Arabia and resumed sexual relations with his wife in February 1991 instead of on 15 March. Would the majority still consider the evidence sufficient to question the presumption of legitimacy? I believe it is for the legislature, and not this Court, to determine what, if any, threshhold requirement must be met before standing is conferred to challenge the presumption under N.C. Gen. Stat. § 8-50.1.

Finally, the majority notes that the trial court concluded that "good cause" had been shown for the granting of Mr. Meehan's motion. "Good cause" is the appropriate standard for ruling on motions predicated on Rule 35 of the North Carolina Rules of Civil Procedure; the trial court in Finding of Fact 19 specifically stated that it was allowing Mr. Meehan's motion "only pursuant to N.C.G.S. § 8-50.1." Thus, whether or not "good cause" was shown for the granting of Mr. Meehan's motion is irrelevant to the issue at hand.

### III.

Resolution of the issue at hand turns, in my opinion, on the correct interpretation of N.C. Gen. Stat. § 8-50.1. I recognize that in *Wright v. Wright*, 281 N.C. 159, 188 S.E.2d 317 (1972), our Supreme Court interpreted the statute to permit the use of blood tests to rebut the marital presumption in civil as well as criminal actions in which the question of parentage arises. However, I do not believe the fact that the Court approved the use of blood tests to rebut the marital presumption in civil cases is dispositive of the issue here. We must

inquire further as to whether the statute allows the court to order a blood test *in the specific factual setting of this case.* In other words, we must determine whether Mr. Meehan, a third-party alleged father, has standing under the statute to compel Mr. Johnson, the presumed father, to submit to such a test. The plain language of N.C. Gen. Stat. § 8-50.1 does not permit such a result.

The version of the statute governing this case provides that upon the motion of the plaintiff, alleged-parent defendant, or other interested party, the court "shall order that *the alleged-parent defendant, the known natural parent, and the child* submit to . . . blood tests. . . ." N.C. Gen. Stat. § 8-50.1(b) (1986) (emphasis added). Thus, the language of the statute only permits the court in this case to order Mr. Meehan (the alleged-parent defendant in Ms. Meehan's action), Ms. Meehan (the known natural parent), and Samantha (the child) to submit to blood tests. The statute does not authorize the court to order the presumed father, Mr. Johnson, to submit to the tests.

The majority attempts to avoid the logical import of this language by stating that since Mr. Johnson is the named defendant in Ms. Meehan's counterclaim and in Mr. Meehan's crossclaim, and since he has alleged in his own complaint that he is Samantha's father, he is an "alleged-parent defendant" and thus can be subjected to blood testing. This argument is disingenuous for two reasons. First, while Mr. Johnson was designated as "defendant" in both Ms. Meehan's counterclaim and Mr. Meehan's crossclaim, neither of these claims alleged that he was Samantha's "parent." Indeed, both claims contain specific allegations that Mr. Johnson is *not* Samantha's parent. Second, while Mr. Johnson's own complaint alleges that he is Samantha's "parent," he is not a "defendant" in his own action. The language of the pleadings cannot convert Mr. Johnson into an "alleged-parent defendant" when in fact he is not.

I do not find the *Ban* decision helpful here. The statute at issue in *Ban* did not involve blood testing, but merely provided that a proceeding to establish paternity of a child born out of wedlock and to compel support could be brought by the mother, the father, or a guardian, conservator, or best friend of the child. The *Ban* court simply held that the term "father" was "intended to mean the putative father, presumed or otherwise." *Ban v. Quigley,* 812 P.2d 1014, 1017 (Ariz. Ct. App. 1990). The *Ban* decision contains no mention whatsoever of the term "alleged-parent defendant" and thus is inapplicable to the instant case.

**JOHNSON v. JOHNSON**

[120 N.C. App. 1 (1995)]

I construe N.C. Gen. Stat. § 8-50.1 as applying only in cases where there is a denial of paternity by one or more parties to the action. For example, suppose the facts of the instant case were changed as follows: Lisa Johnson has a child while married to Sammy Johnson. Believing that Mr. Meehan is the child's natural father, Lisa Johnson sues Mr. Meehan for support. Mr. Meehan denies that he is Samantha's father, and he joins Mr. Johnson as a defendant, alleging that Mr. Johnson is Samantha's natural father. Mr. Johnson denies such allegation. In this hypothetical, the proceeding would be an adversarial one, with each man denying paternity of Samantha, and I would find that under the statute, Mr. Meehan could successfully move for blood tests from Mr. Johnson. This would be true because Mr. Johnson would be an "alleged-parent defendant" in Mr. Meehan's action against him. In contrast, the present proceeding involves a "friendly" action in which Lisa Johnson and Mr. Meehan are joining forces to try to prove that Mr. Johnson, *who has not denied paternity of Samantha*, cannot be Samantha's father.

"In construing a statute, the Court must first ascertain the legislative intent to assure that the purpose and intent of the legislation are carried out. To make this determination, we look first to the language of the statute itself. If the language used is clear and unambiguous, the Court does not engage in judicial construction but must apply the statute to give effect to the plain and definite meaning of the language." *Fowler v. Valencourt*, 334 N.C. 345, 348, 435 S.E.2d 530, 532 (1993) (citations omitted). I am convinced that the language of N.C. Gen. Stat. § 8-50.1 fails to include Mr. Johnson in the group of persons who can be compelled to submit to blood testing.

IV.

Because the language of N.C. Gen. Stat. § 8-50.1 is unambiguous, there is no need to go behind the statute to determine the legislature's intent in passing it. However, I choose to briefly address the legislative history because I believe it supports my position that the statute was not intended to be used in situations such as the present case. There is a clear expression of legislative intent in the preamble to the 1979 version of the statute:

Whereas, . . . a recent breakthrough in medical science now enables extended factor blood tests to show the inclusionary probability that a putative parent is the biological parent of a child; and

Whereas, a great many of the children born out of wedlock join the public welfare rolls and thereby increase the burden on State taxpayers; and

Whereas, the availability of inclusionary . . . results of extended blood factor tests promotes the use of objective medical evidence in parentage matters . . . and thereby facilitates the plaintiffs' ability to fairly and accurately meet their burden of proof; and

Whereas, [this] has the effect of placing the burden of supporting illegitimate children on the persons who should be responsible, the biological parents. . . .

1979 N.C. Sess. Laws ch. 576, § 1.

There is nothing in the foregoing statement to suggest that N.C. Gen. Stat. § 8-50.1 is intended to serve the purpose of declaring a child illegitimate when that child is otherwise presumed legitimate. Rather, the manifest purpose of the statute is to ease the evidentiary burden on parties seeking child support by allowing the results of blood tests to be admitted as proof of the identity of the child's biological parent(s), thereby making it more likely that the child will receive support from the responsible persons. This expressed purpose is fully consistent with the legislative intent behind other statutes dealing with the status of illegitimacy. *See, e.g., Tidwell v. Booker*, 290 N.C. 98, 106, 225 S.E.2d 816, 821 (1976) (purpose behind N.C. Gen. Stat. § 49-2, making willful failure to support an illegitimate child a misdemeanor, is "not to confer rights on either the mother or the father but to protect the child and to protect the State against the child's becoming a public charge"); *Wright v. Gann*, 27 N.C. App. 45, 47, 217 S.E.2d 761, 763 (N.C. Gen. Stat. § 49-14, governing civil actions to determine paternity, was intended by legislature "to establish a means of support for illegitimate children"), *cert. denied*, 288 N.C. 513, 219 S.E.2d 348 (1975). Because Mr. Johnson has acknowledged and met his obligation of support, this case is beyond the purview of N.C. Gen. Stat. § 8-50.1.

V.

In considering cases of first impression, and especially cases involving important public policy concerns, it is often instructive to examine decisions from other jurisdictions which, though perhaps factually different, provide insight into how other courts have resolved similar issues.

**JOHNSON v. JOHNSON**

[120 N.C. App. 1 (1995)]

In *Petitioner F. v. Respondent R.*, 430 A.2d 1075 (Del. 1981), the respondent mother gave birth to a child and named her husband as the father on the birth certificate. Two days later, the petitioner initiated an action alleging he was the child's natural father and seeking in effect to determine his parentage of the child. *Id.* at 1076-77. The mother moved to dismiss the petition on the basis that the marital presumption precluded the petitioner's action, and she and her husband filed affidavits certifying their parentage of the child. The lower court granted the mother's motion, holding that the petitioner lacked standing to file the petition. The petitioner appealed, arguing that the denial of standing violated his due process and equal protection rights. *Id.* at 1077.

The Delaware Supreme Court rejected the petitioner's argument, noting that under the pertinent custody statute only a "parent" had standing to initiate a custody proceeding or to seek visitation if custody was denied. *Id.* Because the term "parent" was not defined in the statute, the court examined the legislative intent and concluded that the General Assembly did not intend to include in its definition of the word "parent" a putative father in the petitioner's situation. *Id.*

> [T]o assume otherwise would be to conclude that the General Assembly intended to open the door to the invasion of continuing family stability by any man, whatever his motive, who may choose to claim an illicit paternity, thereby not only endangering that stability but also refuting the time-honored presumption of legitimacy of a child born during wedlock.

*Id.* Addressing the petitioner's constitutional arguments, the court acknowledged that the United States Supreme Court has generally recognized that unwed fathers are entitled to the protections of the Constitution, *see, e.g., Stanley v. Illinois*, 405 U.S. 645, 31 L. Ed. 2d 551 (1972), but stated that

> the Supreme Court has not held in our view, that a man claiming paternity has a constitutionally protected interest in a determination of his parental status for purposes of obtaining custody or visitation rights with respect to a child conceived and born during the marriage and cohabitation of the child's mother to and with another who has not disavowed the child's legitimacy.

*Id.* at 1078-79. Furthermore, assuming *arguendo* that the putative father had a constitutionally protected interest, "that interest would be outweighed by the competing public interest and public policy" of

preserving the intact family unit and "protecting the minor child from confusion, torn affection, and the life-long stigma of illegitimacy." *Id.* at 1079. The court concluded its opinion as follows:

> "The application of the presumption of legitimacy of a child born to a married woman would be in the child's interest in practically all cases. If the mother's husband does not disavow paternity, there is no reason to go after the child's true father. Whatever the current weight of the family protection argument may be, it certainly should prevent the illegitimate father from seeking to assert his claim to a child resulting from his union with a married mother."

*Id.* at 1080 (*quoting* Harry D. Krause, *Illegitimacy: Law and Social Policy* 77 (1971)).

In the *Michael H.* case, discussed by the majority, the United States Supreme Court upheld a California statute providing that the marital presumption could be rebutted only by the husband or wife and then only in limited circumstances. The petitioner alleged that he was the biological father of Victoria D. and that the statute violated due process by preventing him from exercising his parental rights. *Michael H. v. Gerald D.*, 491 U.S. 110, 115-16, 105 L. Ed. 2d 91, 100-01. The Supreme Court's first inquiry was whether the petitioner, as an outsider to the marriage, had the requisite standing to assert any parental rights. *Id.* at 120, 105 L. Ed. 2d at 103-04. The Court denied such standing and held that California had a substantive interest in limiting third parties' ability to assert parental rights over a child born into a woman's marriage to another man:

> [T]he ability of a person in Michael's position to claim paternity has not been generally acknowledged . . . . What counts is whether the States in fact award substantive parental rights to the natural father of a child conceived within, and born into, an extant marital union that wishes to embrace the child. We are not aware of a single case, old or new, that has done so.

*Id.* at 125, 127, 105 L. Ed. 2d at 107-08.

As the majority notes, the *Michael H.* Court did not hold that presumptive fathers can never have standing to challenge the marital presumption of legitimacy. However, the Court did recognize the states' ability to place limitations on such standing. I believe that N.C. Gen. Stat. § 8-50.1, though admittedly less restrictive than the statute at issue in *Michael H.*, contains just such a limitation.

In *Ex parte Presse*, 554 So. 2d 406 (Ala. 1989), the Alabama Supreme Court extended the rationale of *Michael H.* to a case involving a motion for blood testing. The facts showed that Ms. Presse had an affair with Dr. Koenemann while she was married to Mr. Presse. She subsequently gave birth to a child. After the Presses divorced, Ms. Presse married Dr. Koenemann. The child then came to live with the Koenemanns, who sought to have Dr. Koenemann declared the father. At their request the court ordered blood tests of all the parties which showed a 99% probability that Dr. Koenemann was the child's natural father but did not exclude Mr. Presse as the natural father. The lower court ruled that Dr. Koenemann was the natural father, *id.* at 408, and the Alabama Supreme Court reversed, phrasing the issue as follows:

> Does a man claiming to be the father of a child conceived and born during the marriage of its mother to another man have standing under the [Alabama Uniform Parentage Act] to initiate an action to establish that he is the father of the child, where the presumed father persists in the presumption that he is the father?

*Id.* at 411. The court then answered this "first impression issue" in the negative. *Id.*

The Alabama Uniform Parentage Act (UPA) in effect at the time provided that

> [a] man is presumed to be the natural father of a child if:
>
> > (1) He and the child's natural mother are or have been married to each other and the child is born during the marriage. . . .

Ala. Code § 26-17-5(a) (1986 Repl. Vol.). Dr. Koenemann argued that in spite of this presumption, he should be declared the child's natural father because, after marrying Ms. Presse, he "receive[d] the child into his home" (one of several bases upon which paternity could be asserted under the UPA).

The court rejected this argument:

> We cannot accept the proposition that our Legislature, in adopting the UPA, intended for a third party to be able to assert his paternity, to the exclusion of a man who was married to the child's mother when the child was conceived and born, simply because the third party has since married the man's divorced wife and, in so doing, allowed the child into his home. That argument does not comport with our understanding of the statute.

*Presse, supra*, at 411. The court noted that Mr. Presse was clearly entitled to the marital presumption codified in subsection (a)(1), *id.*, and held that Dr. Koenemann's attempt to assert his paternity under the presumption in (a)(4) failed for lack of standing under the rationale of *Michael H.*, *id.* at 414, concluding:

> In this case, as in *Michael H.*, the legal question is whether a man has standing to bring an action seeking to declare a child illegitimate and to have himself declared the father of that child. This is not permitted under the UPA, as long as there is a presumed father, pursuant to § 26-17-5(a)(1), who has not disclaimed his status as the child's father; consequently, another man, though he later marries the mother and lives with the mother and child, has no standing to challenge the presumed paternity of the child. Put another way, so long as the presumed father persists in maintaining his paternal status, not even the subsequent marriage of the child's mother to another man can create standing in the other man to challenge the presumed father's parental relationship.

*Id.* at 418.

The court in *John M. v. Paula T.*, 571 A.2d 1380 (Pa.), *cert. denied*, 498 U.S. 850, 112 L. Ed. 2d 107 (1990) addressed the same issue before our Court under facts which closely parallel those in this case. Paula T. and John M. had an affair while Paula was married to Michael. After the affair ended, Paula gave birth to the second child born during her marriage to Michael. John moved to compel Michael to submit to a blood grouping test to prove that John was the child's natural father. *Id.* at 1381-82. He predicated his motion on a rule providing that

> [w]hen the mental or physical condition (including blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination . . . only on motion for good cause shown. . . .

*Id.* at 1383 (*quoting* Pa. R. Civ. P. 4010(a)). The trial court denied John's motion, holding that he had not overcome the presumption of legitimacy, *id.* at 1382, but on appeal the superior court reversed the trial court.

The Pennsylvania Supreme Court then reversed the superior court, holding that the Uniform Act on Blood Tests to Determine Paternity (the Act), 42 Pa. C.S.A. §§ 6131 to 6137,

relaxes the [marital] presumption "to some extent" for it explicitly provides that the presumption "is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child." However, the Act does not relax the presumption to the extent that a "putative father," a third party who stands outside the marital relationship and attempts to establish paternity over a child born to the marriage, may compel the "presumptive father," the husband, to submit to blood tests on the strength of such evidence as has been presented herein.

Indeed, section 6133 of the Act does not give the putative father the *right* to compel a presumptive father (husband) to submit to blood tests. That section provides: "In any matter . . . in which paternity . . . of a child is a relevant fact, the court . . . upon motion of any party . . . shall order the mother, child *and alleged father* to submit to blood tests." Superior Court has previously interpreted section 6133 as affording no right to an "alleged father" in appellee's situation to compel a "presumptive" father-husband to submit to a blood test.

*Id.* at 1384-85 (emphasis in original) (citations omitted).

The common thread in these cases is the requirement that in considering whether a state statute confers standing upon a third-party alleged father to rebut the marital presumption, a court must construe the statute narrowly to afford maximum protection to the interests of the presumed father and the child. I agree with the *John M.* court that "[t]he right of any person to question paternity is not without limitation" and must be balanced with the rights of the person whose blood sample is sought, the needs and interests of the child, and the needs and interests of the wife-mother. *John M., supra,* at 1385-86.

## VI.

I am in agreement with the majority that when making a decision which will affect a child, a court must consider first and foremost "the best interests of the child." *See, e.g., Glesner v. Dembrosky,* 73 N.C. App. 594, 598, 327 S.E.2d 60, 63 (1985) ("trial courts have the duty to decide domestic disputes, guided always by the best interests of the child"). *See also Cleo A.E. v. Rickie Gene E.,* 438 S.E.2d 886, 889 (W. Va. 1993) (citation omitted) (in holding that a mother and father could not enter into a stipulation which would have the effect of bastardiz-

ing the child born during their marriage, the court was "guided by the cardinal principal that 'the best interests of the child is the polar star by which decisions must be made which affect children' ").

The majority notes that the trial court's order arose in the context of a proceeding involving custody and that in such proceedings, the court, in determining the child's best interests, may consider evidence of paternity. The majority cites decisions from various jurisdictions to support its conclusion that "in the context of a proceeding to award custody of a minor child, an order compelling the parties to submit to blood-grouping and DNA testing to determine paternity 'will best promote the interest and welfare of the child.' " I cannot agree with this conclusion. The trial court's order, which is the subject of this appeal, made no findings regarding custody of Samantha Johnson. In the absence of such findings and objections thereto, this Court is powerless to assert any opinion about what is in Samantha's best interests. Moreover, the majority's conclusion seems to reach beyond the facts of this case to make a general pronouncement that in *all cases* involving child custody where blood tests are sought, the trial court is *bound* to allow the tests. In effect, the majority has removed all discretion from trial judges to determine what is in the best interests of the child in those cases.

Even if this Court were empowered to determine what is in Samantha's best interests, I would not agree with the majority's holding in this case. In spite of the Johnson's divorce, there is still a parent-child relationship which deserves protection here. *See Happel v. Mecklenburger*, 427 N.E.2d 974, 983 (Ill. App. Ct. 1981) (where parents were divorced, but child visited father on vacations, father visited child when possible, and father "continued to shoulder the parental responsibility of the child," court found challenge to child's legitimacy was not in child's best interests). I find the State's interest in protecting the relationship between Samantha and Mr. Johnson no less compelling simply because the Johnsons are no longer married. Furthermore, if not for the fact that Lisa Johnson and Mr. Meehan have now married, the effect of the majority's holding would be to declare Samantha illegitimate. In future cases with similar facts, children could indeed be declared illegitimate, and I fail to see how such a result would ever be in their best interests.

## VII.

The legislature has defined the circumstances in which a party may invoke N.C. Gen. Stat. § 8-50.1 to use blood tests to rebut the

marital presumption. It is for the legislature to extend the reach of the statute to give standing to a third-party putative father to require a presumed father to submit to a blood test. I would therefore hold that the trial court erred in allowing Mr. Meehan's motion to compel Mr. Johnson to submit to a blood test pursuant to N.C. Gen. Stat. § 8-50.1, and I would reverse.